293 N.J. Super. 170 (1996)
679 A.2d 1206
J. JOSEPHSON, INC., PLAINTIFF-RESPONDENT,
v.
CRUM & FORSTER INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, LUMBERMEN'S MUTUAL CASUALTY COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY AND ZURICH-AMERICAN COMPANY, DEFENDANTS, AND HARTFORD INSURANCE GROUP, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 1996.
Decided August 6, 1996.
*172 Before Judges KING, LANDAU and KLEINER.
*173 Michael F. O'Neill argued the cause for appellant (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Susan R. Rubright, on the brief).
Ellis Medoway argued the cause for respondent (Archer & Greiner, attorneys; Mr. Medoway and Edward C. Laird, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This pollution insurance coverage dispute presents several issues for resolution. We conclude that the Law Division judge: (1) correctly decided that New Jersey's substantive law applied even though the waste disposal was in the Commonwealth of Pennsylvania; (2) correctly construed the implications of the comprehensive general liability policy (CGL) in the circumstances of the lawful disposal of hazardous waste through properly licensed and regulated haulers and disposal sites; (3) incorrectly granted summary judgment to the insured in the face of a claim that the insured intentionally polluted in violation of the standard enunciated in Morton International v. General Accident, 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), where the record and discovery were too incomplete for such a factual determination; and (4) incorrectly ruled that pollution coverage was available under the personal injury endorsement feature of the insured's CGL policy, see United States Bronze Powders, Inc. v. Commerce & Industry Insurance Company, 293 N.J. Super. 12, 17-18, 679 A.2d 674 (App.Div. 1996).

I.
On February 2, 1990 plaintiff J. Josephson, Inc. (plaintiff) filed a nine-count complaint against defendants, Kemper Insurance Group (Kemper), Lumbermen's Mutual Casualty Company (Lumbermen's), Fireman's Fund Insurance Company (Fireman's Fund), Hartford Insurance Group (Hartford or defendant) and Crum & *174 Forster Insurance Company (Crum & Forster), plaintiff's general liability insurers, seeking a declaratory judgment that it was entitled to a defense and indemnification from these defendants in connection with environmental pollution claims made against plaintiff with respect to three waste sites in New Jersey, one New York site and another in Elkton, Maryland. Hartford denied the material allegations of the complaint and asserted separate defenses, including a bar to coverage by the exclusions in Hartford's liability policies.
On November 1, 1991 plaintiff filed a second amended complaint adding two additional insurers as defendants: Pacific Employers Insurance Company (Pacific) and Zurich-American Insurance Company (Zurich). The complaint added a demand for declaratory relief seeking coverage relating to claims arising out of a waste site in Pennsylvania and also added a claim for bad faith; plaintiff deleted claims concerning the Elkton, Maryland site. Defendant answered and denied liability under its policy.
Pursuant to Case Management Order I, plaintiff moved for partial summary judgment on the issues of choice of law and the interpretation of the pollution exclusion clauses in defendant's policy. Also the Case Management Order also stayed discovery pending the summary judgment motion on these substantive issues.
The motion was heard by Judge Napolitano on May 14, 1992. At that time Hartford took the position that no decision on choice of law could be made because discovery had not been completed and plaintiff had denied the requisite discovery. The judge dismissed Hartford's concern, noting that the Case Management Order barred discovery pending these motions. The judge said that he had everything he needed to resolve the choice of law issue, namely, the existence of the policies, the location of the sites, and the identity of the parties. He concluded that New Jersey law applied. He did not address the requested interpretation of the pollution exclusion clauses in the policies at that time. One year later, in April 1993, the judge issued a written decision, subsequently published, J. Josephson v. Crum & Forster Ins. Co., *175 265 N.J. Super. 230, 626 A.2d 81 (Law Div. 1993), in which he elaborated on his reasons for finding that New Jersey law applied to all locations, both in-state and out-of-state. In a footnote the judge declined to render the requested interpretation of the pollution clauses, concluding that at this stage of the litigation, such a ruling would be nothing more than an advisory opinion. Id. at 233 n. 1, 626 A.2d 81. After the judge issued his written decision, Lumbermen's sought leave from this court to appeal that portion of the decision dealing with the choice of law. The motion was denied on June 28, 1993.
On March 28, 1994 plaintiff moved for summary judgment against all defendants as to all sites involved in the litigation. Hartford cross-moved for partial summary judgment on the issue of precisely when the damage occurred with respect to three New Jersey sites and as to all policies which contained an absolute pollution exclusion clause. Four days before the return of the motion, Hartford moved on short notice to amend the judge's choice-of-law order. Prior to the motion hearing date, September 23, 1994, plaintiff reached a settlement and dismissed all defendant carriers from the action except Hartford. This settlement left only the claims against Hartford regarding the Industrial Solvents and Chemical Company (ISCC) Pennsylvania site in issue.
Plaintiff's summary judgment motion was argued before Judge Napolitano on September 23, 1994. Again, Hartford argued that summary judgment was inappropriate because there was insufficient discovery to enable the court to determine whether plaintiff intentionally discharged a known pollutant. The judge disagreed. Holding that the law required coverage in environmental tort cases except where the insured intended to cause the harm, the judge found further discovery unnecessary because "there is no sensible way to infer intent to harm the environment when [as here] licensed waste haulers are used to dispose of waste properly in accordance with very specific regulatory requirements." The judge found, as a matter of law, that plaintiff "did not intend *176 environmental damage when it follows the law and uses licensed waste haulers to dispose of [hazardous waste]." The judge found it "inconceivable that this type of behavior could be consistent with an intention to pollute."
The judge refused to revisit his decision on the choice-of-law ruling and denied Hartford's motion in that regard. He also denied Hartford's cross-motions for partial summary judgment.
On September 23, 1994 the judge ordered Hartford to pay plaintiff about $153,000 in incurred remediation costs and $266,000 for incurred defense costs, plus prejudgment interest. Hartford was also ordered to assume the defense of and indemnification for future claims.
No order issued, however, with respect to the denial of Hartford's cross-motions for partial summary judgment on the absolute pollution exclusion clauses and Hartford's application for reconsideration of the choice-of-law ruling. Hartford raised a series of objections to the form of plaintiff's proposed order on these issues. On January 24, 1995 the judge filed an order denying Hartford's cross-motion for partial summary judgment based on the absolute pollution exclusion clauses. He found it unnecessary to reach that issue because the Hartford policies upon which plaintiff was granted summary judgment were sufficient to cover the defense and indemnification costs awarded plaintiff. The judge also found that the personal injury liability endorsement provided an alternative basis for coverage, even if the absolute pollution exclusion clauses barred coverage. Finally, Hartford's application for reconsideration of the choice-of-law ruling was denied. On the same day, the judge filed a supplemental order, (1) granting plaintiff's motion for summary judgment against Hartford, and (2) modifying the amounts Hartford was ordered to pay plaintiff for counsel fees and interest awarded under the September 23, 1994 order.

II.
Plaintiff is a Georgia corporation which manufactures wall coverings. Since 1969 plaintiff's principal place of business has been *177 in South Hackensack, New Jersey, where it leased four buildings and maintained over one hundred employees.
In the wallcovering manufacturing process, various patterns were printed on a sheet known as a substrate, composed of PVC or paper sheeting. The primary machinery employed in the process were Gravure printers which used several stations to apply various colors to the substrate and used inks mixed with one or more solvents. Different types of wastes were created in this process. One type was created from the non-reusable material left in the printing pans; another was scrap substrate generated from a defective product or the process of trimming the substrate to the appropriate dimensions; pan washers which were essentially washing machines for the ink-mixture pans created another type of waste; and, finally, the rags used to manually wipe down some of the pans were also waste materials.
These wastes were considered hazardous. Plaintiff contracted with licensed waste disposal haulers to transport and dispose of them. The type of waste generated and transported by these haulers was identified on DEP official waste manifests. The documents showed that plaintiff contracted with Scientific Chemical Processing, Inc. (SCP) to transport and treat some of its waste which SCP deposited at three locations in New Jersey: 416 Paterson Plank Road, Carlstadt; 411 Wilson Avenue, Newark; and Lone Pine in Freehold.
In May 1985 the U.S. Environmental Protection Agency (EPA) notified plaintiff that the agency considered it a potentially responsible party for costs incurred in the cleanup of the Carlstadt site which had been contaminated by waste generated by plaintiff, among others. Plaintiff received a similar notice in September 1985 with respect to the Lone Pine site and eventually another as to the Wilson Avenue site. Plaintiff notified its insurers of these claims, requesting a defense and indemnification pursuant to the policies issued by the respective insurers.
Between 1979 and 1980, plaintiff had contracted with Hazardous Waste Disposal to transport and dispose of about twelve shipments *178 of its waste, which eventually were deposited at the Shore Realty Site in Glenwood Landing, New York. By letter of August 3, 1989 the State of New York notified plaintiff that it was considered a potentially responsible party for costs incurred in the cleanup of contamination occurring at the Shore Realty Site.
Between 1982 and 1984, plaintiff contracted with the Delaware Container Company (Delaware Container) for waste removal and treatment. Delaware Container transported this waste to the ISCC site in Yorkhaven, Pennsylvania, on fourteen occasions. On December 5, 1990 the Pennsylvania Department of Environmental Resources (DER) notified plaintiff that it was responsible for costs related to the cleanup of contamination in the soil and ground water surrounding the ISCC site, which damage was allegedly caused in part by the disposal of plaintiff's waste.
Between 1978 and 1987, the period involved in this case, plaintiff was insured by various comprehensive general liability contracts issued by the defendant insurers. These policies were all procured through John M. Riehle, Inc., a New York City insurance broker. There is no dispute about the availability of the Hartford policies during the pertinent periods.
As noted, plaintiff settled with Lumbermen's, Zurich and Pacific prior to the September 23, 1994 argument on the summary judgment motion. The settlement with Pacific and Zurich required those companies to pay plaintiff an undisclosed lump sum. The agreement with Lumbermen's also required payment of a lump sum and payment of all defense and remediation costs incurred by plaintiff in connection with the New Jersey sites. Plaintiff entered into a "de minimis" settlement agreement with regard to the New York Shore Realty site in 1993. Thus, only the costs of defense and indemnification for remediation of the ISCC site in Pennsylvania remain at issue in this case. All of the waste deposits at that site were made during the period of Hartford's coverage.
Hartford issued a series of primary comprehensive general liability (CGL) and umbrella or excess policies to plaintiff, effective *179 between May 25, 1982, and November 1, 1986. All of the CGL policies effective May 25, 1982 through May 25, 1986, and the excess policies effective May 25, 1982 through May 26, 1984, contained the standard pollution exclusion clause, which provides that:
This insurance does not apply:
....
(f) to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants, into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.
The primary policy effective May 25, 1986 through November 1, 1986, and the excess policies effective May 26, 1985 through November 1, 1986 contained an absolute pollution exclusion clause in two forms: the first was a separate endorsement which provided a detailed exclusion clause and the second was a substitute for another exclusion clause, exclusion D. Those absolute pollution exclusion clauses provided as follows:
It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:
1. to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
(a.) at or from premises owned, rented or occupied by the named insured;
(b.) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste;
(c.) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured or any person or organization for whom the named insured or any person or organization for whom the named insured may be legally responsible; or
(d.) at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations:
(i) if the pollutants are brought on or to the site or location in connection with such operations; or
(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

*180 2. to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.
Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.
The parties agreed that Exclusion D is eliminated and replaced by the following:
D. to bodily injury and property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminates or pollutants into or upon land, the atmosphere or any water course or body of water.
Defendant Hartford now appeals from the grant of summary judgment to plaintiff holding it liable to defend and indemnify plaintiff under the terms of the policies and assessing damages for costs incurred in the defense of the actions filed against it with respect to the ISCC Pennsylvania site.
Hartford raises a number of issues on appeal which we summarize:
I. WHETHER THE JUDGE ERRED IN DENYING DEFENDANTS MOTION FOR RECONSIDERATION OF ITS CHOICE OF LAW DECISION.
II. WHETHER THE JUDGE ERRED IN GRANTING PLAINTIFF SUMMARY JUDGMENT.
A. DID THE JUDGE MISINTERPRET THE SUPREME COURTS TEST FOR DETERMINING THE SCOPE OF THE POLLUTION EXCLUSION CLAUSE SET OUT IN MORTON.

B. DID THE JUDGE MISINTERPRET MORTON'S TEST FOR DETERMINING WHETHER THERE WAS A COVERED OCCURRENCE UNDER THE POLICY.
C. WAS SUMMARY JUDGMENT INAPPROPRIATE BECAUSE DISCOVERY WAS INCOMPLETE.
III. WHETHER THERE WAS COMPETENT EVIDENCE TO SUPPORT THE JUDGE'S ASSESSMENT OF DAMAGES AGAINST HARTFORD AND WHETHER DAMAGES SHOULD HAVE BEEN APPORTIONED ON A PRO RATA BASIS.
IV. WHETHER THE JUDGE'S ORDER IN PLAINTIFF'S FAVOR ON THE ABSOLUTE POLLUTION EXCLUSION CLAUSE WAS SUPPORTED BY ADEQUATE FINDINGS.

*181 V. WHETHER THE JUDGE ERRED IN AWARDING PLAINTIFF ATTORNEY'S FEES.
VI. WHETHER THE JUDGE ERRED IN DENYING DEFENDANTS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE NEW JERSEY SITES ON THE GROUND THAT THE PROPERTY DAMAGE WAS MANIFEST BEFORE THE INCEPTION OF DEFENDANT'S POLICIES.
Our review of the record convinces us that the judgment must be affirmed in part, remanded in part, and reversed in part.

III.
We consider first the choice-of-law issue because it is outcome determinative. Hartford contends that the judge erred in denying its motion for reconsideration of his choice-of-law ruling because he was legally incorrect in ruling that New Jersey law governed the interpretation of an insurance policy which involved waste dumped at an out-of-state site. Plaintiff responds that Hartford has waived its right to challenge the judge's choice-of-law ruling because it did not oppose plaintiff's motion for partial summary judgment on that issue. Pointing to a footnote in Lumbermen's opposition brief and to a statement made by defendant's counsel during oral argument on the choice-of-law motion in May 1992, plaintiff maintains that defendant chose not to oppose plaintiff's motion seeking to have New Jersey law applied to the interpretation of the policies. From this evidence, plaintiff concludes that defendant has no standing to challenge the judge's decision either on the motion for reconsideration or on appeal.
We conclude that plaintiff misreads the position taken by Hartford in the Law Division. The footnote in Lumbermen's brief says only that Hartford agreed that Judge Napolitano should apply New Jersey's choice-of-law principles to the facts at hand to resolve the issue of what law "should apply to the sites which are the subject matter of this litigation." By that statement Hartford was not abandoning its opposition to plaintiff's claim that New Jersey substantive law should apply to the declaratory judgment proceeding. It was stating only that the Law Division should use New Jersey's choice-of-law rules to determine which law would *182 apply to the substantive issues raised by the declaratory judgment action. Similarly, at the oral argument on the choice of law motion, counsel told the court "that your Honor should utilize the choice of law principles which your Honor believes are applicable in this jurisdiction." Although counsel went on to say that "We do not tell you what state law should apply to a particular issue which your Honor may be considering," we do not read this as asserting that defendant was electing to abandon the issue. Rather, defendant seemed to say it would like the judge to use New Jersey's choice-of-law precepts to determine whether New Jersey or another state's law should govern the interpretation of the policy provisions.
Although it is true, as plaintiff points out, that two other insurers, but not Hartford, unsuccessfully sought leave to appeal Judge Napolitano's decision on the choice of law (J. Josephson v. Crum & Forster Ins., supra, 265 N.J. Super. 230, 626 A.2d 81), the fact that Hartford did not join is not determinative. Without leave to appeal, Hartford was required, like the others, to wait until a final decision was rendered in order to challenge the choice-of-law ruling. R. 2:2-3(b).
The question before us is whether Judge Napolitano correctly concluded New Jersey law applied to this declaratory judgment action where the plaintiff was seeking coverage under an insurance policy issued by defendant for damages incurred when its waste was deposited in an out-of-state site. Defendant contends that the judge rendered a decision at odds with our Supreme Court's pronouncement on controlling choice-of-law rules in Gilbert Spruance v. Pennsylvania Manufacturers, 134 N.J. 96, 629 A.2d 885 (1993), Gilbert Spruance was decided on July 21, 1993, three months after the judge's written decision in the case before us. Defendant claims this ruling condemns the judge's analysis and conclusion as erroneous.
We think defendant is wrong in its claim that the judge's approach to the choice-of-law problem is at odds with the analysis used by our Supreme Court in Gilbert Spruance. On the contrary, *183 the judge's methodology in analyzing this choice-of-law problem was quite similar to that employed by our Supreme Court in its decision three months later.
The factual contexts of Gilbert Spruance and this case are reverse images of each other. In Gilbert Spruance the Court was concerned with which law would apply in construing a policy containing a pollution exclusion clause where the insured was a Pennsylvania manufacturing concern which had consigned its waste to independent haulers who transported the waste to landfills in New Jersey. Those New Jersey sites were later the basis of multiple toxic tort claims for personal injury and property damage against the insured. 134 N.J. at 98, 629 A.2d 885. In the present case, the insured is a New Jersey corporation whose waste was disposed of by licensed waste haulers at waste sites in Pennsylvania, as well as in New York, New Jersey and Maryland.
Our Supreme Court held in Gilbert Spruance that in determining which choice-of-law rule will govern interpretation of CGL policies, we must look first to the Restatement (Second) of Conflicts of Laws, § 193. That section provides that the law of the state, which the parties understood was the principal location of the insured risk will govern, unless some other state has a more significant relationship to the transaction and to the parties when measured under principles set out in the Restatement, supra, § 6. But where the subject matter of the insurance is an operation or activity which is predictably multi-state, the significance of the principal location of the insured risk diminishes and the governing law is that of the state with the dominant significant relationship according to the principles set out in Restatement § 6. Gilbert Spruance, supra, 134 N.J. at 112, 629 A.2d 885. Under Restatement § 6, the general considerations pertinent to a court's conflict-of-law analysis are (1) the needs of the interstate and international systems; (2) relevant policies of the forum; (3) relevant policies of other interested states and the relative interests of the states in the determination of a particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the *184 particular field of law; (6) certainty, predictability and uniformity of result; and (7) ease in the determination and application of the law to be applied. Id. at 103, 629 A.2d 885.
The Court also addressed the problem of how to determine where the insured risk is located. With respect to hazardous-waste cases the Court rejected an arbitrary choice of either the state of generation or the state of disposal. Instead, because the risk (waste disposal) was transient "a more extended analysis pursuant to [Restatement] § 6(2) is appropriate to determine whether apart from or in addition to § 193 significance, [either state] has a more significant relationship to the transaction and the parties." Id. at 112-13, 629 A.2d 885, (quoting A. Johnson & Co. v. Aetna Casualty & Sur. Co., 741 F. Supp. 298, 300 (D.Mass. 1990), aff'd, 933 F.2d 66 (1st Cir.1991)). The Court concluded that when the facts of the case before it were measured against the principles enunciated in Restatement § 6, New Jersey had the dominant significant relationship in Gilbert Spruance where out-of-state-generated waste foreseeably came to rest in New Jersey. Id. at 113, 629 A.2d 885.
Relying upon this court's decision in Gilbert Spruance v. Pennsylvania Mfrs. Ass'n Ins., 254 N.J. Super. 43, 603 A.2d 61 (App. Div. 1992), aff'd, 134 N.J. 96, 629 A.2d 885 (1993), Judge Napolitano came to the conclusion that New Jersey law would apply to the interpretation of the pollution exclusion clauses contained in the several policies, with respect to determining coverage for the waste sites located in New Jersey. J. Josephson, supra, 265 N.J. Super. at 238, 626 A.2d 81. In determining which law governed interpretation of policies where the waste sites were located out-of-state, the judge rejected a standard which would uniformly apply the law of the state where the hazardous waste site was located. He opted for a more flexible approach. He analyzed the Restatement § 6 factors to determine which state had a substantial interest in seeing its law applied. Id. at 239-40, 626 A.2d 81. He then engaged in an extended and detailed analysis of those factors and concluded that New Jersey had a substantial interest *185 in the outcome of the litigation, a substantial contact with at least one of the principal litigants, and a strong public policy affecting health, safety and welfare at odds with at least one competing state (Pennsylvania). He decided that New Jersey law should apply to the interpretation of these insurance policies, no matter where the waste site was located. Id. at 245, 626 A.2d 81.
We conclude that defendant's claim that the judge's method of analysis was inconsistent with the method employed by our Supreme Court in Gilbert Spruance is unfounded. The approach taken was the same: use of the Restatement § 6 factors to determine which state had the more significant relationship to the transactions and the parties.
The Supreme Court was well aware of Judge Napolitano's decision and recognized that Gilbert Spruance did not encompass "the problem presented when waste generated in New Jersey predictably is disposed of in another state." 134 N.J. at 113, 629 A.2d 885. The Court remarked that the U.S. District Court in Leksi, Inc. v. Federal Ins. Co., 736 F. Supp. 1331 (D.N.J. 1990), held unequivocally that "in the absence of a choice of law provision [in the insurance contracts], the state where the toxic waste comes to rest is the state whose law will apply, provided it was reasonably foreseeable that the waste would come to rest there." Gilbert Spruance, supra, 134 N.J. at 113-14, 629 A.2d 885. Our Supreme Court continued:
Specifically, we express no view on the proposition stated in J. Josephson, Inc., supra, that when another state is the foreseeable location of the waste-site, the court must engage in a section 6 analysis to determine if that state has the most significant relationship with the parties, the transaction, and the outcome of the controversy  an analysis that requires the court "to sift through and analyze, however laborious [the task], the competing and varied interest of the states involved.... 265 N.J. Super. at 239, 626 A.2d 81."
[Id. at 114, 629 A.2d 885.]
We do not think that the Supreme Court was suggesting that Judge Napolitano's approach was incorrect. While the Court quoted from Leksi, we think that the Court was expressing no opinion either way. The Court was simply contrasting Leksi's *186 unequivocal stance holding the site of the waste disposal determinative in the choice-of-law with Josephson's Restatement § 6 analysis. Though the Supreme Court adopted Leksi's conclusion that when Restatement § 6 principles were applied to cases where out-of-state generators deposited waste in New Jersey, and this State had the dominant significant relationship, the Court did not endorse Leksi and embrace its principles in their entirety. Instead, the Court expressly declined to consider the situation posed in the case before us: waste generated in New Jersey and disposed of in another state.
This precise factual situation was recently before the Third Circuit in General Ceramics Inc. v. Firemen's Fund Ins. Co., 66 F.3d 647 (3d Cir.1995). There, General Ceramics, a New Jersey company which manufactured ceramic products at its main plant in Haskell, New Jersey, contracted with private waste haulers to transport its contaminated waste from that facility to a resource recovery and processing facility in McAdoo, Pennsylvania. In 1981 General Ceramics received notice from the EPA and the Pennsylvania DER that it was required to participate in a cleanup, monitoring and remediation program for the McAdoo site because of its 1977 and 1978 waste deposits. General Ceramic sought indemnification from its insurer, Home Insurance Company (Home), incorporated in New Hampshire with its principal place of business in New York. All of General Ceramic's policies were obtained through a New York insurance broker. The Home policies were occurrence-based and contained the standard pollution exclusion clause providing that the exclusion would not apply if the discharge, release, dispersal or escape of pollutants was sudden and accidental.
In the federal district court in New Jersey, summary judgment was granted in favor of Home. General Ceramic's cross-motion for summary judgment was denied on the ground that Pennsylvania law applied and that under Pennsylvania law, the gradual discharge of pollutants was not covered under the sudden and accidental exception to the pollution exclusion clause. Id. at 650-51. *187 The Third Circuit disagreed with that conclusion and held that New Jersey law applied and that coverage was provided for property damage caused by the gradual release of pollutants into the environment. Id. at 651.
In arriving at that conclusion, the Third Circuit relied primarily upon our Supreme Court's holding in Gilbert Spruance. Id. at 652-54. The court said that the district court also relied upon Gilbert Spruance, and had concluded, erroneously, that Pennsylvania law would apply to this contract dispute. The Third Circuit posited that the district court had succumbed to the temptation of extracting a "bright line rule" from Gilbert Spruance, i.e., the state in which the waste disposal site is located has the most significant contacts with the subject matter of the litigation  cleanup of a hazardous waste site  and therefore the disposal state's substantive law should be applied as long as it was reasonably foreseeable to the contracting parties that the insured's waste could predictably come to rest in that state. Id. at 654-55. The Third Circuit rejected that understanding, concluding that Gilbert Spruance stood for a more flexible analysis under the Restatement principles, particularly Restatement §§ 6 and 193. The court used the Restatement-favored factors in analyzing whether, under the facts of the case before it, New Jersey or Pennsylvania was the state with the more significant relationship to the transaction and the parties. Id. at 655.
Of the factors set out in Restatement § 6(2), the Third Circuit found critical the competing interest of the respective states in having their particular rules govern in light of the purposes and policies behind each of those competing rules. Id. at 656. The competing rules were Pennsylvania's and New Jersey's respective judicial interpretations of the "sudden and accidental" exclusion exception in CGL policies. Ibid. In arriving at its conclusion that coverage was available even where the discharge of pollution was gradual, our Supreme Court in Morton focused upon the insurance industry's misrepresentation that the pollution exclusion clause would not reduce liability coverage. Id. at 656-57 (citing Morton *188 Intern., supra, 134 N.J. 1, 629 A.2d 831). The Third Circuit observed that New Jersey's interpretation of that policy provision was born of a concern for insureds who purchased coverage based on the state's regulatory approval of the standard CGL policies. The underlying policies prompting this interpretation by our high court were the protection of the New Jersey insureds and the integrity of New Jersey insurance contract negotiations, as well as promotion of honest dealings with this State's regulatory agencies. Id. at 657. These interests were implicated in the case before it. The Third Circuit observed that the insured was a New Jersey corporation with its main plant and headquarters in New Jersey, from which it paid its premiums on the policy. This public policy focus in Morton was contrasted with the focus in Gilbert Spruance where the insured was located out-of-state and the waste was generated out-of-state but resulted in in-state environmental damage. The state interest implicated in Gilbert Spruance was New Jersey's interest in securing financial resources to remediate New Jersey toxic waste sites and compensate New Jersey victims of pollution. Ibid.
In examining the policies behind the Pennsylvania court's more restrictive interpretation of the pollution exclusion clause exception, the Third Circuit observed that the interpretation reflected Pennsylvania's interest in giving effect to the literal meaning of unambiguous contract terms. Pennsylvania's rejection of claims that the "sudden and accidental" exception afforded coverage for gradual pollution reflected a view that the contracting parties were in the best position to ascertain their own needs. Pennsylvania ostensibly had decided that a secure commercial environment will exist if it enforces commercial agreements entered into between private parties "as written" and remains neutral on the substance of those agreements. Thus, the Third Circuit concluded that Pennsylvania's rule was designed to not intrude upon the contracting parties by giving them the freedom to bargain for and agree on the allocation of risk which they deemed appropriate. However, the Third Circuit also observed that this interest is implicated only when at least one of the parties is a Pennsylvania *189 domiciliary  a situation which did not exist in the case before it which involved a New Jersey insured, General Ceramics; a New Hampshire insurer, Home Indemnity; and a New York insurance broker. That the waste ultimately ended up in Pennsylvania was not controlling, even though the Commonwealth's policy was to give effect to the plain meaning of an unambiguous contract and leave the allocation of risk to the contracting parties. Id. at 657-58. The Third Circuit concluded that, upon examination of the purposes of each state's law, New Jersey's policy purposes were better served by the application of New Jersey law where its interests and contacts dominated.
This conclusion about the purposes of the respective state's laws governed the Third Circuit's analysis of the remaining Restatement § 6 factors and supported the ruling that New Jersey law should be applied to the interpretation of the pollution exclusion clause in the Home Indemnity policy. Id. at 658-59. The Third Circuit's analysis of a case nearly identical to the present case strongly supports the view that New Jersey law should be applied to these policies even though plaintiff's waste was deposited at a Pennsylvania site. Here we also have a New Jersey generator and insured, policies written and issued by a New York broker, and a Connecticut insurance company. We see nothing in Gilbert Spruance to suggest that the Law Division judge's analysis was incorrect. Indeed, it is entirely consistent with both Gilbert Spruance and the Third Circuit's decision in General Ceramics. Although the Law Division judge did not engage in quite the same analysis of the respective policies and purposes of New Jersey's and Pennsylvania's legal interpretations of the pollution exclusion clause language, he used the same framework of analysis and arrived at the same conclusion as the Third Circuit on facts virtually identical to those in General Ceramics.
Gilbert Spruance makes clear there is no bright line rule with respect to deciding conflict-of-laws issues where environmental litigation is concerned. The Third Circuit recognized this and, interestingly enough, Judge Napolitano perceived this even though *190 he did not have the benefit of the Supreme Court's holding in Gilbert Spruance at the time he rendered his decision. In our view, the Third Circuit's observations of the interests of the two states and its conclusion that New Jersey's policies and purposes are appropriately furthered by the application of its law to cases such as these are equally applicable to the case before us.
We will apply New Jersey's law to Hartford's insurance policies. In the present case, applying New Jersey law will not disrupt Pennsylvania's regulatory efforts because it has demonstrated no interest in interfering with the contractual relationships between New Jersey insureds and their insurers. And, of course, this case does not involve any Pennsylvania insureds or their insurers. We uphold the Law Division's choice-of-law decision: New Jersey law governs the interpretation of the policies issued by Hartford to plaintiff. "[O]nly the purposes of New Jersey law are implicated here...." General Ceramics Inc., supra, 66 F.3d at 658. Cf., NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314 (3rd Cir.1995) (New York held state with dominant interests). For a recent example of governmental-interest analysis in choice-of-law see Gantes v. Kason Corporation, 145 N.J. 478, 679 A.2d 106 (1996).

IV.
In three separate points, defendant argues that summary judgment was improperly granted to plaintiff because: (1) the judge misinterpreted the Supreme Court's test for determining the scope of the pollution exclusion clause set out in Morton; (2) the judge misinterpreted Morton's test for determining whether there was a covered occurrence under the policy; and (3) the judge granted summary judgment inappropriately because discovery was incomplete.

IV(A).
Defendant contends that the judge failed to properly apply Morton's "intentional discharge of a known pollutant" test to *191 determine whether the insurance policies' pollution exclusion clauses would preclude coverage under the facts of this case. Defendant asserts that the judge erred "in grafting onto the Morton pollution exclusion ruling an exception where the waste is transferred to and transported by a licensed waste hauler."
In Morton our Supreme Court settled the vexing questions of how the standard pollution exclusion clause and the definition of a covered "occurrence" found in CGL policies should be interpreted where claims for coverage were based on environmental pollution. There, the insured sought coverage for cleanup costs related to the remediation of Berry's Creek, a waterway polluted by discharges from a mercury processing plant operated for over forty years by Morton's predecessors. 134 N.J. at 7-8, 629 A.2d 831. Morton sought coverage under policies which provided indemnification for property damage "resulting from an occurrence" except where that property damage arose out of the discharge, dispersal, release or escape of contaminants or pollutants in or upon land. That exclusion, however, did not apply if "such discharge, dispersal, release or escape is sudden and accidental." Id. at 11, 629 A.2d 831. An occurrence was defined as an "unexpected event or happening ... or a continuous or repeated exposure to conditions" resulting in property damage "provided the insured did not intend or anticipate that injury to or destruction of property would result." Id. at 10, 629 A.2d 831.
In establishing the scope of the pollution exclusion clause, the Court held that the phrase "sudden and accidental" related not to the damage caused by the pollution, but only to the "discharge, dispersal, release or escape" of pollutants for which coverage was provided. Consequently, the Court held that the phrase "sudden and accidental" described "only those discharges, dispersals, releases, and escapes of pollutants that occur abruptly or unexpectedly and are unintended." Id. at 28-29, 629 A.2d 831. However, the Court went on to state that such an interpretation would "sharply and dramatically" restrict the coverage that previously had been provided under CGL policies for property damage *192 caused by accidental pollution, because prior thereto, under occurrence-based policies, coverage was provided for any type of property damage that was "neither expected nor intended from the standpoint of the insured." Id. at 29, 629 A.2d 831. When the standard pollution exclusion clause was presented to state insurance regulatory agencies, the industry maintained that the exclusion would simply clarify existing coverage and there would be a continuation of coverage for pollution-caused injuries which resulted from an accident. Ibid. However, the language of the clause did not support that representation. Rather, the clause virtually eliminated pollution-caused property damage coverage. For that reasons, the Supreme Court declined to enforce the standard pollution exclusion clause as written and held instead that
notwithstanding the literal terms of the standard pollution-exclusion clause, that clause will be construed to provide coverage identical with that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected. We expressly limit our holding concerning the limited effect of the pollution-exclusion clause to cases in which the insured or an agent specifically authorized to act for the insured intentionally discharges a known pollutant.
[Id. at 78, 629 A.2d 831.]
Applying that holding to the case before him, Judge Napolitano concluded:
I am prepared to find as a matter of law ... that I'm sure that it [Josephson] did not intend environmental damage when it follows the law and uses licensed waste haulers to dispose of it, because the Legislature at least on two levels of government, state and federal, unless there is something glaring here that we all have missed [sic], it's inconceivable that this type of behavior could be consistent with an intention to pollute; that's the finding that I am prepared to make. It's a common sense finding. It's also based on the fact that nothing is here to contradict that.
... [T]here is no sensible way to infer intent to harm the environment when licensed waste haulers are used to dispose of waste properly in accordance with very specific regulatory requirements or face egregious statutory penalties; for those reasons the court finds as a matter of law that Josephson did not intend to dispose of the waste in such a way as to cause an environmental harm.
Defendant vigorously disagrees with this holding. On this appeal, defendant takes the position that the hauler is the agent of the generator of the waste and, as such, when the hauler intentionally *193 discharges a known pollutant, that intent is imputed to the generator-insured, who is barred from recovery under the policy by operation of the pollution exclusion clause. Thus, the question presented by this appeal is whether, for the purposes of a CGL policy, an insured-generator of waste "intentionally discharges a known pollutant" when it gives its waste to a licensed hauler who disposes of that waste in such a manner that it leaks or escapes and pollutes the environment. As presented, this is a fairly novel issue in this State and nearly everywhere else. While there are a few cases involving questions of insurance coverage for insured-generators and pollution-related damages caused by third-party disposal of the generator's waste, only several have faced this precise query. The others have focused on the interpretation of the "sudden and accidental" exception in the pollution exclusion clause; the resulting interpretation determined coverage under the policy. Whether there actually was an intentional discharge of a known pollutant by the insured was not a factor.
The District of New Jersey federal court dealt with this issue in Nestle Foods Corp. v. Aetna Casualty and Surety Co., 842 F. Supp. 125 (D.N.J. 1993), a case relied upon by plaintiff and roundly criticized by defendant. (The Nestle reasoning was rejected by a California federal district court in Trico Industries, Inc. v. Travelers Indemnity Co., 853 F. Supp. 1190, 1193 (C.D.Cal. 1994), where the court, applying Missouri law, concluded it could not follow the Nestle interpretation of the pollution exclusion clause.)
In Nestle, the court granted the plaintiff-insured's motion for summary judgment, finding the pollution exclusion clause did not apply. Nestle had contracted with a licensed waste hauler to transport and dispose of its waste, which the hauler took to the Lone Pine Landfill. Id. at 127. Nestle was subsequently notified by the New Jersey DEP that it was a potentially responsible party with respect to the cleanup of the landfill. Nestle sued its insurer, Aetna, when it refused to provide a defense and indemnify it for the cleanup costs. Ibid. In concluding that the pollution *194 exclusion clause in Aetna's policy did not bar coverage, the court quoted Morton's holding that the pollution exclusion clause would apply only to insureds who intentionally discharged a known pollutant. Id. at 131. However, the court did not examine Nestle's intent with respect to the pollution discharge. Rather the court's framing of the question focused on the discharge, not on Nestle's intent: "Did Nestle discharge the known pollutant," not "Did Nestle intend to discharge a known pollutant." While the court noted that there was no dispute that Nestle's wastes were intentionally discharged into the landfill by the independent hauler, the court found:
[T]he plain and ordinary meanings of "discharge, dispersal, release or escape" do not encompass the transfer of wastes to an independent hauler which, in turn, disposes of the wastes at a landfill as a matter of law. All of these terms intrinsically evoke a transition from a state of confinement to movement... [T]he argument advanced by Aetna that deposit of wastes in a landfill is intentionally discharged into the landfill "misses the point so far as the actual language of the policies is concerned." ... Likewise, all of Aetna's arguments and citations in support of its contention that "[a]s long as there is a reasonable relationship between the pollution and the pollutants, coverage is excluded," Deft. Opp. Brf. at 4, are not consistent with the scope of the pollution exclusion established by Morton (insured "... intentionally discharged ... a known pollutant").... Although Morton does not construe the term "discharge," this court is guided by the premise that the plain meaning of the pollution-exclusion clause itself compels the conclusion that "discharge, dispersal, release or escape" does not extend to the disposal of waste at a landfill under the circumstances attendant to Nestle's claims. Accordingly, Nestle's motion for summary judgment on the pollution exclusion is granted, since Aetna has failed to meet the threshold definition of "discharge," as that term is employed under Morton. Therefore, Aetna is barred from raising the pollution exclusion clause as a means of denying coverage on the subject policies.
[Id. at 131-32.]
The New Jersey federal district court relied in part on language in a case where the Sixth Circuit held the pollution exclusion clause barred coverage for insured-assessed "EPA cleanup costs for an industrial waste site to which its licensed waste hauler carted the waste and stored it at the contaminated site." F.L. Aerospace v. Aetna Cas. & Sur. Co., 897 F.2d 214, 215-16 (6th Cir.1990), cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). Although the Sixth Circuit found the exclusion applicable *195 because the "discharge, release, dispersal or escape of pollutants into the environment" was not "sudden and accidental" since it took place over a period of years, the court agreed that the "mere delivery of waste for storage at a facility that is licensed to store waste is not a discharge of pollutants into the environment." Id. at 220.
U.S. Fidelity & Guaranty Co. v. Specialty Coatings, 180 Ill. App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071, appeal denied, 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989), a case discussed by Morton, supra, 134 N.J. at 64, 629 A.2d 831, also involved an insured's liability for environmental pollution due to its independent waste recycler's illegal dumping of the insured's waste. 129 Ill.Dec. at 308-09, 535 N.E.2d at 1073-74. There the insured argued that the pollution exclusion clause was inapplicable because it was ambiguous and should be construed against the insurer. The insured claimed that the exclusion's language did not specify that it applied only when the insured actively discharged the pollutant or even where the polluting acts were done by third parties. Id. 129 Ill.Dec. at 310-11, 535 N.E.2d at 1075-76. The Illinois appellate court agreed that the clause was ambiguous for that reason and also noted, as did Morton, that the insurance industry misrepresented the scope of coverage available under the policy, given the pollution exclusion clause's requirement that the discharge, release, dispersal, or escape of pollutants be sudden and accidental. Id. at 311-13, 535 N.E.2d at 1076-78. That combination of factors led the court to affirm the lower court's finding that the pollution exclusion clause did not apply. Id. at 313, 535 N.E.2d at 1078.
Buckeye Union Insurance Co. v. Liberty Solvents and Chemicals Co., 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984), also cited by Morton, 134 N.J. at 66, 629 A.2d 831, involved an independent waste hauler whose disposal of the defendant's waste rendered the defendant liable for costs incurred to clean up polluted surface waters, soil and groundwater in and around the disposal site. Id. 477 N.E.2d at 1229. The Ohio Court of Appeals found nothing in *196 the complaint filed against the insured to compel the conclusion that it intended or expected the environmental harm, thereby putting the insured's claim outside the policy definition of a covered occurrence. The court also held that, from the standpoint of the insured, the release of the contaminants was sudden and accidental; therefore, the policy's pollution exclusion clause was not a bar to recovery. Id. at 1233, 1235. That same rationale was used by the Ohio Court of Appeals three years later in Kipin Industries, Inc. v. American Universal Insurance Co., 41 Ohio App.3d 228, 535 N.E.2d 334, 337-38 (1987), to find coverage for pollution-related damages caused by the plaintiff's waste hauler's improper disposal of the plaintiff's waste.
Our research discloses four additional cases involving insureds who were sued for pollution-related damages actually caused by their waste haulers; in all of these cases the courts found no coverage. In Ray Industries, Inc. v. Liberty Mutual Ins. Co., 974 F.2d 754, 769 (6th Cir.1992), Borg-Warner Corp. v. INA, 174 A.D.2d 24, 577 N.Y.S.2d 953, 957-58 (1992), leave to appeal denied, 80 N.Y.2d 753, 587 N.Y.S.2d 905, 600 N.E.2d 632 (1992); and Centennial Ins. Co. v. Lumbermens Mutual Casualty Co., 677 F. Supp. 342, 348-49 (E.D.Pa. 1987), the courts found that the respective policies' pollution exclusion clauses applied because the pollution took place over a long period and thus could not qualify for the exclusion's exception as a sudden and accidental occurrence. The New York court specifically asserted it was irrelevant that the waste was actually dumped into the landfill by an independent transporter: "The plain language of the pollution exclusion precludes coverage for the insured's liability arising out of `the' (not `its') discharge of pollutants." Borg-Warner, supra, at 577 N.Y.S.2d at 958. That same rationale was the sole basis for the Sixth Circuit Court of Appeals' ruling that the pollution exclusion clause in the insurance policy barred coverage to the insured. In United States Fidelity and Guaranty Co. v. Whitesides Co., 932 F.2d 1169 (6th Cir.1991), the insured argued that the exclusion did not apply because it had merely delivered the toxic waste to a transporter for disposal and had not itself *197 released any pollutants into the environment. Id. at 1170. The court rejected the claim, holding that "the policy does not say that U.S.F. & G. will not insure against liability for Whitesides' release. Rather, it says that it will not insure against liability for the release. Whitesides' liability to EPA arises out of the release of the substance." Id. at 1171.
Because of our Supreme Court's holding in Morton, these cases which turn on a different interpretation of the "sudden and accidental" pollution exclusion clause are of no help in resolving the present case. Indeed, it appears that the only cases similar in factual context and legal underpinning to the present situation is the Nestle decision and CPS Chemical Co. Inc. v. Continental Ins. Co., 199 N.J. Super. 558, 564-65, 489 A.2d 1265 (Law Div. 1984), modified and rev'd on other grounds, 203 N.J. Super. 15, 495 A.2d 886 (App.Div. 1985); the Law Division opinion was cited with approval in Morton, supra, 134 N.J. at 45, 629 A.2d 831. In CPS Chemical, the Law Division stated in a similar disposal context: "In order to satisfy the accidental aspect, it is sufficient that a person engaged by plaintiff [insured] is alleged to have committed acts which were not expected or foreseen by the plaintiff, ... As between the plaintiff and its insurance carrier, and viewed from the standpoint of the insured, the acts were accidental." 199 N.J. Super. at 565, 489 A.2d 1265. The CPS Chemical view has been cited with approval in similar contexts in Continental Ins. v. N.E. Pharm. & Chem., Inc., 811 F.2d 1180, 1183 n. 5 (8th Cir.1987), and Mraz v. American Universal Ins. Co., 616 F. Supp. 1173, 1177 (D.Md. 1985).
There is one recent Appellate Division decision on the periphery of the issue presented here which is instructive. In Astro Pak Corp. v. Fireman's Fund Ins. Co., 284 N.J. Super. 491, 665 A.2d 1113 (App.Div.), certif. denied, 143 N.J. 323, 670 A.2d 1065 (1995), the insurers appealed from a declaratory judgment ruling that their CGL policies issued to the plaintiff-insured, a licensed transporter of hazard waste, required them to indemnify it against a landfill operator's claims that it was liable for clean-up and remediation *198 costs incurred as a result of pollution which leaked out of a landfill and into the adjoining Raritan River. Id. at 493-94, 665 A.2d 1113. The policies contained a standard pollution exclusion clause, and both insurers argued that the plaintiff intentionally deposited the pollutants at the landfill and that the exclusion was fully applicable to this waste hauler. The trial judge found otherwise, concluding that the pollution exclusion clause was inapplicable because the waste was deposited at an approved dump, a site licensed by the State to receive it. Id. at 500, 665 A.2d 1113. We agreed with the trial judge and rejected the insurer's argument. We held:
The trial judge here determined that the discharge into the state-approved landfill was not the polluting of the "environment." While this statement might be somewhat broad if applied to unusual situations, it is clear that Astro Pak's actions constituted possible pollution only because of the defective nature of the landfill. The offending "pollution" was the escape caused by this defect, not the placing of the pollutants into the landfill.
[Id. at 501, 665 A.2d 1113.]
Judge Dreier's opinion in Astro Pak provided an explanation by way of analogy, stating that had Astro Pak deposited polluting material in a large above-ground tank over a period of time and the tank later leaked, one could not say that pollution had been caused each time a bucket of sludge had been thrown into the tank. It was the escape of the pollutants from the tank which caused the damage and "would be the operative event." Ibid. The analysis would not change if that tank were in-ground or on another's property, "provided it was reasonable to assume that the tank was capable of holding the pollutants and was properly authorized by the State to receive the material." Ibid.
While Astro Pak might not squarely answer the question of a generator's liability or intent to pollute, one could certainly conclude that if a transporter is not deemed to have intentionally polluted a landfill when it deposits waste at a facility licensed to receive the waste, then the generator could not be guilty of intentional pollution on an agency theory.
*199 In the case before us, defendant's focus is on Nestle, which defendant argues we should not follow because it goes beyond Morton's holding and ignores Morton's focus on the intent and knowledge of the insured. Admittedly, Nestle does not address the insured's intent. However, defendant ignores the fact that an insured's intent is irrelevant unless it is related to the "discharge of a known pollutant." It seems logical to us that there must first be a determination that there has been a "discharge" by the insured of a known pollutant before there need be an inquiry as to whether that discharge was intentional. The Nestle court took the first step and concluded that there was no discharge by the insured; the discharge was accomplished by an independent waste hauler. Therefore, the Nestle court had no need to examine the issue of the insured's intent. Consequently, we do not agree with defendant that Nestle is out of line with Morton and should be disregarded by us.
One question not answered (or even asked) in the Nestle case was whether the independent transporter could be deemed an "agent specifically authorized to act for the insured intentionally discharging a known pollutant." Morton, 134 N.J. at 78, 629 A.2d 831. If plaintiff in the case before us was not "discharging" when it gave its waste to the transporter for disposal, the transporter was not acting as its agent for the purposes of discharging polluting waste. Viewing plaintiffs conduct in a common sense manner, it seems to us likely that plaintiff Josephson was releasing its waste to the transporter for the purpose of having it disposed of properly and lawfully. We think it is important to remember that plaintiff's liability for the property damage caused at the waste disposal site is created by virtue of a statute making generators of waste deposited at a site, which thereafter becomes contaminated absolutely liable for the site's cleanup, regardless of the legality of the disposal in the first instance. See Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. §§ 9601 to 9675 (CERCLA). There is no similar "strict liability" concept implicated when interpreting the scope of the *200 standard pollution exclusion clause under Morton. Unless the insurer establishes that the insured intentionally discharged a known pollutant or had specifically authorized an agent to act for it in intentionally discharging a known pollutant, the pollution exclusion clause will not bar coverage. The insurer must establish that the insured and the hauler or carrier in effect knowingly collaborated or conspired to intentionally discharge known pollutants illegally or improperly before coverage is voided. If the insured followed the rules and engaged a responsible licensed hauler to legally dispose of hazardous waste and had no knowledge of or complicity in illegal disposal, the coverage is enforceable.
The judge here found, as a matter of law, that plaintiff did not "intend environmental damage when it follows the law and uses licensed waste haulers to dispose of it." The judge found it "inconceivable that this type of behavior could be consistent with an intention to pollute." The judge then found "as a matter of law that Josephson did not intend to dispose of the waste in such a way as to cause an environmental harm." The judge focused on plaintiff's intent, finding none as a matter of law. If these were indeed the facts, the judge was no doubt correct.
The closest analogy to Judge Napolitano's finding is that of the trial judge in Astro Pak when he concluded that the discharge into a state-approved landfill did not constitute the polluting of the environment. But that finding in Astro Pak was made at the end of a trial after all the proofs were presented. The judge was able to assess Astro Pak's conduct in light of the fully developed record. Indeed, we there cautioned that the trial court's statement was too broad to be universally applied. We found the statement acceptable in that case because the facts established that the pollution was caused solely by the leaking landfill and not by the deposits into the landfill. Astro Pak, supra, 284 N.J. Super. at 501, 665 A.2d 1113.
Here, summary judgment was granted on the finding, as a matter of law, that the insured had no intent to pollute. It seems logical to conclude that there is no intent to discharge a known *201 pollutant if, as in Astro Pak, lawfully placing pollutants in a licensed landfill does not constitute environmental pollution, or if, as in Nestle, there is no discharge where waste is transferred to an licensed independent hauler for proper disposal.
Nevertheless, there was a substantial factual question raised by defendant Hartford as to whether such a finding was at all appropriate for summary judgment on this record, given the fact that this case involves a question of intent, and the incomplete discovery and unclear state of the record.

IV(B).
The judge actually made no explicit holding that there was a covered occurrence. The question is, what effect did his finding as to plaintiff's intent to pollute have on defendant's argument that there was no occurrence because the property damage was expected or intended from the standpoint of the insured.
Morton held that in environmental litigation whether there has been a covered occurrence requires a case-by-case analysis to determine the existence of "exceptional circumstances that objectively establish the insured's intent to injure [the environment]." Morton, 134 N.J. at 86, 629 A.2d 831, (quoting Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 185, 607 A.2d 1255 (1992)). The Court said:
Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
[Morton, supra, 134 N.J. at 86-87, 629 A.2d 831.]
On appeal, defendant complains that the judge's finding of no intention to pollute where wastes are consigned to a licensed hauler ignored the "legal standards" set out above. Defendant also complains that making such a determination in the absence of completed discovery deprived it of the opportunity "to explore and establish the five objective factors brought to light by Morton."
*202 If plaintiff did not intentionally discharge a known pollutant into the environment when it consigned its waste to a responsible licensed hauler, it could not have either expected or intended to injure the environment when this waste was deposited in the landfills so as to exempt the claims against plaintiff from the policy definition of a covered occurrence. Nevertheless, Morton stressed that the resolution of the occurrence question requires a case-by-case, fact-sensitive inquiry as to all of the factors listed in the opinion. Indeed, the Supreme Court in Morton proceeded to "focus on those factors that [the Court] previously... identified [as] significant" in determining whether the trial court there properly concluded, as a matter of law, that Morton's predecessors had intended or expected environmental injury. 134 N.J. at 91, 629 A.2d 831. The Supreme Court was able to do so, even though that finding was made on a motion for summary judgment, because "the trial court in this proceeding had before it extensive discovery and testimonial evidence" from a prior litigation "sufficient to permit an informed determination about whether material factual issues remained in dispute." Id. at 90, 629 A.2d 831. This is precisely what defendant in the present case claims was lacking before the motion judge, making it inappropriate to summarily dispose of the occurrence issue and the pollution exclusion clause issue.
We conclude that the judge's finding as a matter of law that plaintiff did not intentionally discharge known pollutants did not properly resolve the issue of whether there was a covered occurrence under these policies. The judge was required to make a more thorough analysis of the facts in light of the factors set out by the Supreme Court in Morton. We conclude that this could not have been done on summary judgment on this record.

IV(C).
We next turn to defendant's contention that the plaintiff's motion for summary judgment should not have been entertained because discovery had not been completed. R. 4:46-2 directs that *203 a court should deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates a "genuine issue as to any material facts challenged." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 529, 666 A.2d 146 (1995). Brill, the most recent pronouncement of our Supreme Court on summary judgment motions, did not focus on the length of time a party had to discover the evidence necessary to create a genuine material fact issue before a matter was ready to be evaluated on a motion for summary judgment. The motion itself may be made as early as twenty days from the service of the complaint. R. 4:46-1. Nevertheless, case law has made plain, a matter is not "ripe" for summary judgment where discovery is incomplete.
In Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 193, 536 A.2d 237 (1988), our Supreme Court reversed our affirmance of summary judgment because the case had not been fully developed with respect to critical factual issues. Recently, we reversed orders for summary judgment entered in two cases where the matters were not at the appropriate stage for disposition. In Hermann Forwarding Co. v. Pappas Ins. Co., 273 N.J. Super. 54, 640 A.2d 1200 (App.Div. 1994), a suit seeking to recover an over-payment of premiums submitted to the defendant broker, we held that
we are satisfied that this matter as a whole was not ripe for determination by summary judgment. As we have observed, the critical factual issues were not fully developed before the trial court. Pretrial discovery had not been completed. According to a letter submitted to the motions clerk by Liberty Mutual in opposition to the summary judgment motions, depositions have not been taken and neither Credit Corporation nor the Pappas defendants had answered interrogatories. Thus, the summary judgment motions were premature and the trial court should not have entertained them. The motions should have been either continued, dismissed or denied in order to afford Liberty Mutual a reasonable opportunity to complete pretrial discovery.
[Id. at 64, 640 A.2d 1200.]
Similarly, in Rutgers v. Liberty Mutual Ins. Co., 277 N.J. Super. 571, 649 A.2d 1362 (App.Div. 1994), appeal dismissed, 143 N.J. 314, 670 A.2d 1057 (1995), we reversed the grant of partial summary *204 judgment to plaintiff and "remanded the matter to the Law Division for complete development of the factual record so that a proper determination" as to coverage could be made. Id. at 582, 649 A.2d 1362. However, discovery must proceed in a timely fashion. When the incompleteness of discovery is raised as a defense to a motion for summary judgment, that party must establish that there is a likelihood that further discovery would supply the necessary information. Auster v. Kinoian, 153 N.J. Super. 52, 378 A.2d 1171 (App.Div. 1977).
The question then is: was defendant here afforded a reasonable opportunity for discovery on the material issue of whether plaintiff expected the disposal of its waste would harm the environment, which implicated questions concerning "the quality of [plaintiff's] knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent [plaintiff's] conduct, and the existence of subjective knowledge concerning the possibility of likelihood of harm." Morton, supra, 134 N.J. at 86-87, 629 A.2d 831.
Plaintiff's original complaint was filed in February 1990, amended twice in March of 1990 and amended again in November 1991. Hartford responded twice, in July 1990 and again in December 1991. In December 1990 Hartford propounded interrogatories and document demands upon plaintiff. Among the questions defendant asked of plaintiff were those seeking the identification of "each person who is or was primarily responsible for overseeing the disposal of waste material at the site;" the identity of persons having knowledge of or charged with the responsibility for releasing, storing, transporting or disposing of plaintiff's hazardous waste; the identity of all substances generated as waste by plaintiff; and the identity of any consultants employed by plaintiff regarding the management and disposal of hazardous waste material. Plaintiff's response to these interrogatories was particularly vague when it came to providing names of individuals who might provide information. Josephson repeatedly claimed ignorance of those individuals who were "primarily responsible" for either *205 overseeing operations at the landfills or overseeing the disposal of waste materials. Instead, plaintiff offered to make available to defendant documents it had received regarding the landfill sites which "may contain information" sought after by defendant.
On December 20, 1991 Judge Napolitano issued Case Management Order I which suspended resolution of "the various discovery motions presently pending before this court" as well as "any discovery motions which may hereinafter be filed" until plaintiff's motion for partial summary judgment on the issues of choice of law and pollution exclusion clause interpretation were resolved. Apparently, this stay of the discovery motion resolution operated as more than simply a suspension of discovery-motion practice. It was seemingly understood by all, particularly the judge, that the discovery process had been halted. In the May 14, 1992 oral argument and subsequent oral decision on plaintiff's choice-of-law motion, plaintiff's counsel tried to explain to the judge that there had only been "some discovery" to that date. The judge responded:
Well, you shouldn't feel defensive about the absence of discovery. It was my own order that barred that, but Mr. Bowens [Hartford's counsel] will get all the discovery that he wants. You all will after  after today. And you may very well  that's not to say that mind [sic] is easily changed or that it would even be appropriate to go back and forth. But you may very well come up with something which causes you to  to make a motion to have this matter addressed again in light of evidence which you could not know of now because I barred discovery.
On July 6, 1992 plaintiff submitted answers to defendant's supplemental interrogatories. In these answers plaintiff provided the names of four individuals, one of whom was the company environmental counsel, who had information about the company's manufacturing processes. However, when defendant asked for the identity of "all persons having knowledge with respect to the manner in which it was arranged for any of your substances to be disposed of at each [landfill] site," defendant was directed to plaintiff's response to another interrogatory which did not list any names but simply indicated how plaintiff classified its waste for purposes of disposal. Defendant was similarly directed to the same interrogatory answer when it asked for the identity of all *206 persons who had knowledge about the manner in which plaintiff arranged to dispose of its waste, the identity of all persons involved in the hauling of the waste, and for details of the operation and disposal activities at each landfill as well. Plaintiff did, however, provide a list of names of individuals who had responsibility for plaintiff's environmental affairs.
By letter dated July 2, 1993 defendant complained to Judge Napolitano that plaintiff had not submitted fully responsive answers to the supplemental interrogatories which were propounded to elicit information "regarding waste management practices undertaken by plaintiff and plaintiff's knowledge regarding its waste disposal, among other relevant topics." Defendant noted that although plaintiff referred in one answer to Material Safety Data Sheets (MSDS), which it claimed it would release upon entry of a protective order, the order had never been finalized and thus the documents had not yet been produced. Among other things, defendant complained about plaintiff's failure to provide the names of persons involved in the hauling of plaintiff's waste and those engaged in the operation and disposal activities at the landfill. Defendant also complained of plaintiff's failure to provide the names of persons in plaintiff's employ who had responsibility for selecting or inspecting the disposal sites or for shipping or manifesting substances shipped to the site, pointing out that this question, like the others, was relevant to plaintiff's knowledge of how its waste was being handled and whether plaintiff expected or intended the waste would cause damage to the environment. By letter dated September 13, 1993 plaintiff's counsel provided an apparent response to defendant's letter to the court. But this letter did not respond to all of the deficiencies listed by plaintiff, particularly defendant's request for the names of individuals responsible for waste disposal. Plaintiff again promised to provide the MSDS referred to in previous interrogatories.
Defendant was also provided with plaintiff's response to interrogatories propounded by Lumbermen's, although it is not clear from the record precisely when these responses, dated July 6, *207 1992, were in fact provided to defendant. In those responses, plaintiff denied knowing the identity of any of its employees who were responsible for "engaging the services of each waste transporter" who took plaintiff's waste to the landfill sites. Defendant was directed to shipment documents which plaintiff had already provided. However, plaintiff provided Lumbermen's with the names of the same four individuals it listed in Hartford's interrogatories as having knowledge of the manufacturing process and listed as well the source of the raw materials it used in the manufacturing process. In an undated series of responses to Lumbermen's first set of interrogatories (the interrogatories themselves are not included), plaintiff provided a list of seven former employees and two current employees who "may have knowledge of facts relevant to this case." Plaintiff's appellate brief claims that defendant was provided with these answers as part of the discovery process.
As a result of the May 14, 1992 motion hearing, Judge Napolitano ruled notwithstanding plaintiff designated documents as privileged on grounds of confidentiality agreements entered into in the underlying matters were to be turned over to defendant nonetheless. In response, plaintiff provided an amended privilege log of documents listing over 1600 documents as to which plaintiff asserted privileges of attorney-client and work product and which contained additional documents not previously claimed to be privileged. Therefore, in August 1992, defendant moved to compel plaintiff to produce the documents, or, in the alternative, to submit them for an in camera inspection by the court to determine the legitimacy of the claim of privilege.
For reasons unexplained in the record, not until June 16, 1993 did the judge enter a second Case Management Order. That order required, among other things, that plaintiff provide both court and counsel with a privilege log identifying documents plaintiff sought to protect based on the attorney-client or work product privilege. The next case management conference was *208 scheduled for July 27, 1993 at which time "the parties shall be prepared to identify those individuals they may want to depose."
On August 6, 1993 the motion judge conducted a case management conference by telephone. Case Management Order III, entered the same day, required that by August 20, 1993 plaintiff provide defendant with (1) all documents previously demanded but not supplied with the exception of those to which plaintiff claimed a privilege, and (2) more responsive answers to the supplementary interrogatories propounded by the defendants. On September 17, 1993 the judge was to rule on defendant's motion to compel production of documents listed on plaintiff's privilege list and on the same day the court was to hold a case management conference "at which time counsel will identify initial individuals for deposition." According to defendant, the parties never appeared before the court for that purpose in September 1993.
Apparently the parties did not appear before the court again until the September 23, 1994 motion for summary judgment. At that time, defendant took the position that the motion judge could not find as a matter of law that plaintiff did not intend to pollute when it gave its waste to a licensed hauler because the Morton Court made no distinction between the legal or illegal discharge of a known pollutant when it articulated the standard for giving effect to a pollution exclusion clause. Furthermore, the carrier argued that the landfills to which plaintiff's hauler took plaintiff's waste were all shut down by the New Jersey DEP by the late 1970s because of environmental contamination. According to defense counsel, there was a very real question about what plaintiff knew in the 1970s about where its waste was going, the type of arrangement plaintiff had with the haulers, and generally what plaintiff knew about how its waste was being handled.
Plaintiff countered by taking exception to the notion that defendant did not have an opportunity for discovery, pointing to the voluminous documents, responses to interrogatories, and supplemental responses to interrogatories, as well as defendant's access to DEP files, since the case was filed in February 1990. While *209 plaintiff acknowledged that no depositions were taken, it also pointed out that at no time were depositions prohibited. According to plaintiff, defendant knew "about Josephson's people inside that were packaging this waste to go out for independent haulers to take away. They knew the identity of this individual." Plaintiff queried why defendant did not depose these individuals. Defense counsel explained why there were no depositions, noting the "tortured history of trying to obtain documents, trying to sort our privileged documents, privileged logs." She argued that it was "wasteful to depose people from Josephson and then realize later on that plaintiff had subsequent documents," theretofore labeled privileged, which would have a critical bearing on whether the depositions should ever take place. According to defense counsel, if plaintiff had been forthcoming with its documents and privileged logs, "the delays in court would not have happened."
The judge disagreed, ruling "that the argument that there might be something there is groundless because there were adequate instruments of discovery available to discover what might have been there." The judge held that "all of that notwithstanding, I am prepared to find as a matter of law that plaintiff did not intend environmental damage when it follows the law and uses licensed waste haulers to dispose of [the waste] ... it's inconceivable that this type of behavior could be consistent with an intention to pollute."
The judge apparently thought the alleged incompleteness of discovery irrelevant because he was ready to hold as a matter of law that any hazardous waste generator who followed regulations and used a licensed waste hauler to dispose of its waste could not be deemed to have intended to pollute so as to either raise the bar of a pollution exclusion clause or take the polluting incident outside the definition of a covered occurrence. There is support for the judge's reasoning insofar as the pollution exclusion clause is concerned and we agree with it, as a general proposition. That finding, however, was not dispositive of the question of whether there was a covered occurrence because additional factors must be *210 considered in determining whether an insured intended or expected harm would come to the environment as a result of the disposal of toxic waste per the Morton standards.
We are satisfied that the record was not ripe for resolution by summary judgment. We conclude that a remand for further discovery and thereafter a renewed summary judgment motion or a plenary factual hearing is the better way to resolve this rather novel case, especially since the choice of law and coverage concepts now are clarified.
Further, the damage issue must be revisited completely on the remand. We eschew treatment of the damage issue on this record, which is quite inadequate for that task. This remand on damages includes the issue of any counsel fee award for pursuing this declaratory judgment action. R. 4:42-9(a)(6). Such an award must await the outcome of the proceeding and is discretionary. Felicetta v. Commercial Union Ins. Co., 117 N.J. Super. 524, 528, 285 A.2d 242 (App.Div. 1971), certif. denied, 60 N.J. 141, 286 A.2d 514 (1972).

V.
Defendant next contends that the judge erred in denying its motion for partial summary judgment because of its absolute pollution exclusion clause. The judge denied defendant's motion in this aspect on the ground that even if the absolute pollution exclusion barred coverage, there would be coverage under the policy's personal injury liability endorsement. We disagree and reverse on this point. Relying on Harvard Industries, Inc. v. Aetna Casualty & Surety Co., 273 N.J. Super. 467, 642 A.2d 438 (Law Div. 1993), plaintiff contends that the complaint's allegations fall within defendant Hartford's policy coverage for "personal injury" and are thus exempt from the pollution exclusion clause. Plaintiff urges us to adopt Harvard's reasoning. We decline.
Harvard Industries was decided on a motion for summary judgment filed by one of forty carriers sued by Harvard, which was seeking coverage for a variety of occurrences. Id. at 472, 642 *211 A.2d 438. The motion focused on the policy's pollution exclusion clause which denied coverage for "bodily injury" and "property damage" caused by the described pollutants. Harvard argued that the exclusion did not include "personal injury," which was defined by the policy as, among other things, "wrongful entry or eviction, or other invasion of the right of private occupancy." Id. at 476, 642 A.2d 438. Harvard claimed that the trespass and nuisance claims asserted against it fell within that definition of "personal injury." Permitting environmental contamination to migrate onto the property of another constituted both a trespass and a nuisance, as well as an "entry or ... other invasion of the right of private occupancy." Id. at 478, 642 A.2d 438. The Law Division judge agreed.
The judge concluded that because (1) a trespass is an unauthorized entry onto the property of another, (2) the essence of a nuisance is an unreasonable interference with the use and enjoyment of land, and (3) the dispersal of contaminants can unreasonably or substantially interfere with a private property owner's occupancy, claims such as trespass or nuisance were not excluded by the absolute pollution exclusion, but fit within the definition of "personal injury" covered under the policy. Id. at 478-79, 642 A.2d 438.
Hartford's policy here provides coverage for personal injury which it defines as follows:
"[P]ersonal injury" means injury, other than advertising injury, arising out of one or more of the following offenses committed during the policy period in the conduct of the named insured's business:
(1) the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy;
(2) false arrest, detention or imprisonment, or malicious prosecution;
(3) wrongful entry or eviction or other invasion of an individual's right of privacy; or
(4) discrimination or humiliation not committed by or at the direction of the insured or any executive officer, director, stockholder, partner or member thereof, but only with respect to injury to the feelings or reputation of a natural person;
*212 Because Hartford defines "personal injury" in the same terms as the policy considered in Harvard, plaintiff sought coverage under its rationale.
A review of both federal and state cases reveals that few courts have taken the analytical approach of Harvard. The weight of authority holds that, in the presence of a pollution exclusion clause, personal injury coverage is not available for damages caused by environmental pollutants. See United States Bronze Powders, Inc. v. Commerce & Industry Ins. Company, supra, 293 N.J. Super. at 17, 679 A.2d 674.
A California case, often cited by courts dealing with this issue, Titan Corporation v. Aetna Casualty, 22 Cal. App.4th 457, 27 Cal. Rptr.2d 476 (1994), had its genesis in the environmental cleanup operation which accompanied the closing of Titan's New Jersey plant. Aetna denied coverage for the contamination cleanup costs relying on the pollution exclusion clause of its policy. Id. 27 Cal. Rptr.2d at 478. The case went to a bench trial on the issue of whether the policy covered the nearly $900,000 in cleanup costs, which the jury in the first phase of the trial found had been incurred. The trial judge found all of the policy's exclusions inapplicable. The Court of Appeal did not.
On appeal Titan argued that coverage was afforded under the "personal injury" endorsement of the policy because the pollution claims constituted "wrongful entry or eviction or other invasion of the right of private occupancy." The trial judge, in a footnote, agreed with Titan's position but the appellate court disagreed. Id. at 485. The Court of Appeal held:
The trial court's approach violated basic principles of contract interpretation. We interpret contracts (including insurance policies) as a whole, with each clause lending meaning to the others. Importantly we should interpret contractual language in a manner which gives force and effect to every clause rather than to one which renders clauses nugatory. The policy here unambiguously declares it will not pay for either bodily injury or property damage when the cause of such injury or damage is pollution. Under the interpretation urged by Titan and adopted by the trial court, that exclusion will never operate, because the pollution exclusions's "property damage" provisions are relevant only to eliminate liability for third party property injury. However, under the trial court's interpretation, *213 such injury would simply be relabeled as an "other invasion of the right of private occupancy," rendering the pollution exclusion a dead appendage to the policy.
We interpret the coverage afforded by the personal injury portion of the policy as being limited to damage other than the injury to realty which an occupier of land may suffer when his quiet enjoyment of occupancy is disturbed. [Id. at 486 (citations omitted.)]
The California court quoted at length from a case decided the year before where the Pennsylvania Superior Court rejected the insured's claim of coverage for otherwise-excluded pollution damages under the "other invasion of the right of private occupancy" definition of personal injury. The court ruled that:
To hold otherwise would emasculate the clear and unambiguous provisions of the pollution exclusion and could not be justified except as an unwarranted straining to reach a result different than that intended by the parties.
[O'Brien Energy Systems v. American Employers' Insurance Co., 427 Pa.Super. 456, 629 A.2d 957, 964 (1993), appeal denied, 537 Pa. 633, 642 A.2d 487 (1994).]
Accord Union Oil Co. of Cal. v. International Ins. Co., 37 Cal. App.4th 930, 44 Cal. Rptr.2d 4, 7-10 (1995) (following Titan, supra, found no personal injury coverage for gasoline tank lead); Legarra v. Federated Mutual Ins. Co., 35 Cal. App.4th 1472, 42 Cal. Rptr.2d 101, 108-09 (1995) (groundwater contamination by gasoline leak not a covered personal injury as defined in the policy because it clearly fell within the pollution exclusion clause and to allow coverage defeated the policy language).
The New York Court of Appeals took much the same approach in a declaratory judgment action brought by Columbia County, seeking coverage for claims made in a suit against it by a property owner whose land abutted the county's landfill, from which leachate had allegedly contaminated its property. County of Columbia v. Continental Ins. Co., 83 N.Y.2d 618, 612 N.Y.S.2d 345, 347-48, 634 N.E.2d 946, 948-49 (1994). The Supreme Court and Appellate Division found in favor of the insurer. The Court of Appeals affirmed, rejecting the county's claim that the personal injury endorsement provided coverage despite the existence of a pollution exclusion clause in the policies. Id. 612 N.Y.S.2d at 349, 634 N.E.2d at 950. As in Hartford's policy in this case, the policy at issue in Columbia, supra, defined personal injury as a "wrongful *214 entry or eviction or other invasion of the right of private occupancy." Id. 612 N.Y.S.2d at 347, 634 N.E.2d at 948. In ruling on that definition, the New York court held that that endorsement was intended to reach only purposeful acts undertaken by the insured or its agents.
Evidence that only purposeful acts were to fall within the purview of the personal injury endorsement is provided, in part, by examining the types of torts enumerated in the endorsement in addition to wrongful entry, eviction and invasion: false arrest, detention, imprisonment, malicious prosecution, defamation and invasion of privacy by publication. Read in the context of these other enumerated torts, the provision here could not have been intended to cover the kind of indirect and incremental harm that results to property interests from pollution.
[Id. 612 N.Y.S.2d at 349, 634 N.E.2d at 950.]
The court also ruled that to accept the policy construction advanced by the county would render the pollution exclusion clause meaningless. "It would be illogical to conclude that the claims fail because of the pollution exclusion while also concluding that the insurer wrote a personal injury endorsement to cover the same eventuality." Ibid. The court concluded that the personal injury coverage was not available to cover injuries arising from pollution-generated damage. Ibid. See also U.S. Fidelity & Guaranty Co. v. B & B Oil Well Service, 910 F. Supp. 1172, 1183-86 (S.D.Miss. 1995), for a survey of jurisdictions which have dealt with the personal injury protection endorsement and agreed with the reasoning of those cases which held that no coverage for pollution risks was available under the endorsement. Contra, Great Northern Nekoosa Corporation v. Aetna Cas. & Sur. Co., 921 F. Supp. 401 (N.D.Miss. 1996); Titan Holdings Syndicate v. City of Keene, N.H., 898 F.2d 265 (1st Cir.1990); Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co., 976 F.2d 1037 (7th Cir.1992); Blackhawk-Central City Sanitation District v. American Guarantee and Liability Ins. Co., 856 F. Supp. 584 (D.Colo. 1994).
Subsequent federal court decisions have rejected the reasoning of the cases finding coverage, essentially because they effectively rendered the pollution exclusion clause meaningless and violated established tenets of contract interpretation. In Harrow Products, Inc. v. Liberty Mut. Ins. Co., 64 F.3d 1015 (6th Cir.1995), the *215 Court of Appeals upheld the district court's ruling in the insurers' favor that pollution-caused damages could not be recovered under the policies' personal injury coverage in the face of a pollution exclusion clause. Id. at 1022. Citing and discussing at length County of Columbia, supra, 83 N.Y.2d 618, 612 N.Y.S.2d 345, 634 N.E.2d 946, O'Brien Energy Systems, supra, 629 A.2d 957; and Titan Corp., supra, 22 Cal. App.4th 457, 27 Cal. Rptr.2d 476, the court held that the personal injury endorsement does not contemplate coverage for damages to property by pollution because to hold otherwise would contradict the express provisions of a pollution exclusion clause. Harrow Products, supra, at 64 F.3d at 1024. Harrow, applying Michigan law, required the court to give effect to all words in an insurance contract if they serve a reasonable purpose. Ibid. The court expressly rejected the rationale of Titan Holdings Syndicate, 898 F.2d 265, and Pipefitters Welfare Educ. Fund, 976 F.2d 1037, noting that neither opinion addressed the effect of a clear and unambiguous pollution exclusion clause elsewhere in the policy on the personal injury endorsement. Accord Northbrook Indemnity Ins. Co. v. Water Dist. Management Co., Inc., 892 F. Supp. 170, 175-76 (S.D.Tex. 1995), where the court found the absolute pollution exclusion clause unambiguous and found no personal injury coverage for well water contamination because to so find "would render the pollution exclusion meaningless;" East Quincy Services District v. Continental Ins. Co., 864 F. Supp. 976, 980-82 (E.D.Cal. 1994), where the court found no personal injury coverage for a groundwater pollution claim in the face of a pollution exclusion clause and an insurer only has a duty to defend against any personal injury claims distinct from bodily injury and property damage and the term "wrongful entry cannot be understood to cover pollution migrating from another property given the pollution exclusion clause and because the unintended release of pollutants from one property to another does not involve a claim of occupancy by one person over another and is not remotely analogous to the intentional torts that are enumerated in the personal injury coverage;" Staefa Control-System Inc. v. St. Paul Fire & Marine Ins. Co., 847 F. Supp. 1460, *216 1473-74 (N.D.Cal.), amended, 875 F. Supp. 656 (N.D.Cal. 1994), where the court, relying on Titan Corp., found no personal injury coverage for soil and water contamination damage in the face of an unambiguous pollution exclusion clause. Accord U.S. Fidelity & Guaranty Co., supra, 910 F. Supp. 1172. Dryden Oil Co. of New England, Inc. v. Travelers Indemnity Co., 91 F.3d 278 (1st Cir.1996).
Like the federal cases finding coverage for pollution damage claims under personal injury endorsements, Harvard Industries, supra, 273 N.J. Super. 467, 642 A.2d 438, fails to consider or discuss the ramifications of holding that pollution-related claims of trespass and nuisance constitute a covered personal injury in the face of a pollution exclusion clause. New Jersey has long adhered to certain fundamental rules for interpreting insurance policies. Naturally, as contracts of adhesion, such policies are subject to special rules of interpretation. Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 611, 503 A.2d 862 (1986). Policies are construed liberally in the insured's favor so that coverage is afforded "to the full extent that any fair interpretation will allow." Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961), (quoting Danek v. Hommer, 28 N.J. Super. 68, 76, 100 A.2d 198 (App.Div. 1953), aff'd, 15 N.J. 573, 105 A.2d 677 (1954)). Nevertheless, in the absence of an ambiguity, courts must not engage in a strained construction to support the imposition of liability. A court should not write a better policy of insurance for the insured than the one purchased. Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990). Furthermore, insurance policy exclusions are strictly construed. Bello v. Hurley Limousines, Inc., 249 N.J. Super. 31, 40-41, 591 A.2d 1356 (App.Div. 1991). If plainly expressed, insurers are entitled to have liability limitations construed and enforced as expressed. Sinopoli v. North River Ins. Co., 244 N.J. Super. 245, 250-51, 581 A.2d 1368 (App.Div. 1990), certif. denied, 127 N.J. 325, 604 A.2d 600 (1991). Equally fundamental is the principle that an insurance contract must be interpreted by considering the agreement as a whole, and whenever possible, meaning must be given to all of its parts. Owens-Illinois, Inc. v. United Inc. Co., 264 N.J. Super. 460, 490, 625 A.2d *217 1 (App.Div. 1993), aff'd in part, rev'd in part, remanded in part o.g., 138 N.J. 437, 650 A.2d 974 (1994).
The Harvard view bypasses these principles and effectively wipes out the pollution exclusion clause by judicially writing into the policy an exception to that exclusion for pollution-based claims of trespass and nuisance. This is not contract interpretation but a reconstruction and reformulation of the insurance contract. There is nothing in any of our reported decisions to support this result, and the weight of authority elsewhere is to the contrary.
We disagree with Harvard and disapprove the Law Division judge's ruling in favor of plaintiff on this coverage claim. There is no pollution coverage for plaintiff under the personal injury endorsement's trespass and nuisance features in Hartford's policy.
Affirmed in part; reversed in part; remanded for further proceedings.