691 A.2d 383

PERMACEL, A NEW JERSEY CORPORATION, PLAINTIFF–AP-PELLANT, v. AMERICAN INSURANCE COMPANY AND IN-SURANCE COMPANY OF NORTH AMERICA [1], DEFENDANTS–RESPONDENTS, AND FIREMAN'S FUND INS. CO., DEFEN-DANT.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1997—Decided April 3, 1997.

---

[1] Although Insurance Company of North America (INA) is listed as a defendant-respondent in Permacel's Notice of Appeal, INA refers to itself as Century Indemnity Company, successor to CCI Insurance Company, which itself is a successor to INA.

Before Judges HAVEY, KESTIN and EICHEN.

*Diane A. Bettino* argued the cause for appellant (*Picco Herbert Kennedy, P.C.*, attorneys; *Steven J. Picco*, of counsel and on the brief, with *Ms. Bettino*).

*Julius F. Harms* argued the cause for respondent American Insurance Company (*Caron, McCormick, Gordon & Constants*, attorneys; *Mr. Harms*, on the brief).

*Paul R. Koepff*, of the New York Bar, admitted *pro hac vice*, for respondent Insurance Company of North America (*Graham, Curtin & Sheridan*, attorneys; *Joseph R. McDonough, Mr. Koepff*, and *Joseph E. Boury*, on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

Permacel, Inc. (Permacel), a New Jersey corporation, appeals from summary judgment orders in favor of defendant-carriers, which provide that the laws of New York, Connecticut and Maryland apply in interpreting a "pollution exclusion" clause contained in defendants' comprehensive general liability (CGL) policies. Permacel generated hazardous waste in its New Jersey plant and shipped it to five sites in New York, Connecticut and Maryland during the terms of the CGL policies. On appeal, Permacel argues that New Jersey law should apply in determining defendants' duty to defend and indemnify Permacel for claims against it under the Comprehensive Environmental Response Compensation

and Liability Act of 1980 (CERCLA), 42 *U.S.C.A.* § 9601 to § 9675, relating to the clean up of the sites in question. New Jersey law should apply, plaintiff reasons, because New Jersey has the dominant significant relationship to the transaction and the parties according to the principles set forth in *Restatement (Second) of Conflicts of Law* § 6 (1971) (*Restatement*).

We disagree. The CGL policies were issued in California to Permacel's parent company, Avery International Corporation (Avery), having its principal offices in Pasadena, California. Plaintiff was a "named insured" by virtue of its subsidiary status. We therefore conclude that New York, Connecticut and Maryland, the states of disposal, have the dominant significant relationship with the parties and transaction, and therefore their laws should apply to this insurance coverage controversy. Accordingly, we affirm.

Permacel is engaged in the business of manufacturing and marketing pressure-sensitive tapes. Its principal place of business is in New Brunswick, New Jersey. From approximately 1982 to 1988, Permacel was a subsidiary of Avery, a Delaware corporation, with its principal place of business in Pasadena, California. Defendants American Insurance Company (American) and INA issued CGL policies to Avery which contained endorsements covering subsidiaries such as Permacel. The policies were in effect during the 1982–88 time period in question.

All negotiations with regard to the terms and conditions of the defendants' policies were conducted between Avery's brokers and personnel in California. The policies were underwritten, issued and delivered to Avery's brokers in Los Angeles. All premiums were remitted by Avery from its corporate headquarters in Pasadena, through its Los Angeles brokers.

In 1994, Permacel filed an action against defendants seeking a defense and indemnification for alleged CERCLA violations arising out of the five contaminated sites in New York, Connecticut and Maryland. Permacel's CERCLA liability arose because of its shipment of certain flammable and toxic liquids and solid waste

from its North Brunswick production center to the out-of-state sites. The record established that Permacel knew its wastes were being transported to these sites, as evidenced by shipping manifests.

Defendants denied coverage, claiming that Permacel's conduct fell within the pollution exclusion clause of their respective policies. The pollution exclusion clause states that coverage does not apply:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

[ (Emphasis added).]

In granting defendants summary judgment as to the choice-of-law issue, the motion judge concluded that any "pollution exclusion" clause contained in the policies would be construed according to the laws of New York, Connecticut and Maryland, and not New Jersey because the waste sites were in those states. Thereafter, the judge granted defendants' motion for summary judgment dismissing Permacel's complaint. In dismissing, the judge interpreted the pollution exclusion clause applying New York, Connecticut and Maryland substantive law, and concluded that Permacel's activity fell within the scope of the exclusion.

## I

We are called upon to determine which state's substantive law is to be applied to the dispute concerning interpretation of the pollution exclusion clause in defendants' policies. The New Jersey Supreme Court in *Morton Int'l Inc. v. General Accident Ins. Co. of Am.*, 134 *N.J.* 1, 629 *A.*2d 831 (1993), *cert. denied*, 512 *U.S.* 1245, 114 *S.Ct.* 2764, 129 *L.Ed.*2d 878 (1994), while recognizing that the word "sudden" ordinarily connotes a temporal element, nevertheless construed the "sudden and accidental" phrase broadly to permit coverage even when the discharge of pollution is

gradual and does not occur abruptly. The Court reached that conclusion by applying "regulatory estoppel" by virtue of the fact that the insurance industry had represented to New Jersey's regulatory agencies that the pollution exclusion clause was merely intended to clarify the scope of coverage for pollution damages and would not significantly limit the coverage already available. *Id.* at 31–43, 629 *A.*2d 831.

In contrast, New York, Connecticut and Maryland have not extended the definition of "sudden" beyond the temporal element it ordinarily connotes. *See EDO Corp. v. Newark Ins. Co.,* 878 *F.Supp.* 366, 373–74 (D.Conn.1995) (applying New York and Connecticut law) and *see* collected cases; *New York v. AMRO Realty Corp.,* 936 *F.*2d 1420, 1428 (2d Cir.1991) (applying New York law); *American Ins. Co. v. Fairchild Indus., Inc.,* 852 *F.Supp.* 1173, 1180–81 (E.D.N.Y.1994) (applying New York law), *aff'd,* 56 *F.*3d 435 (2d Cir.1995); *Linemaster Switch Corp. v. Aetna Life and Cas. Corp.,* No. CV91–0396432S, 1995 WL 462270, at *30–33 (Conn.Super.Ct. July 25, 1995);[2] *American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 *Md.* 560, 659 *A.*2d 1295, 1308 (1995); *Northville Indus. Corp. v. National Fire Ins. Co.,* 218 *A.D.*2d 19, 636 *N.Y.S.2d* 359, 364–66 (1995), *leave to appeal granted,* 88 *N.Y.*2d 810, 649 *N.Y.S.2d* 377, 672 *N.E.*2d 603 (1996). These out-of-state courts have declared such uniform pollution exclusion clauses unambiguous, rejecting efforts by insureds to include gradual discharges or those merely unintended or unexpected

---

[2] As of the date of this opinion, there is no reported Connecticut case construing the "sudden and accidental" exception to the pollution exclusion clause. In *Olin Corp. v. Insurance Co. of N. Am.,* 762 *F.Supp.* 548, 558 (S.D.N.Y.1991), *aff'd,* 966 *F.*2d 718 (2d Cir.1992), the United States District Court "presumed" that Connecticut courts would interpret the term "sudden and accidental" as plain and unambiguous, first because this view represents the "emerging majority view" throughout the country and second because Connecticut applies the plain meaning of words in a contract provision when the words are clear and unambiguous. *See Griswold v. Union Labor Life Ins. Co.,* 186 *Conn.* 507, 442 *A.*2d 920, 923 (1982). *Accord EDO Corp., supra,* 878 *F.Supp.* at 366. Permacel does not argue on appeal that Connecticut courts give a contrary interpretation to the "sudden and accidental" exception.

within their purview. *See e.g., American Motorists Ins. Co., supra,* 659 A.2d at 1308–11.

Traditionally, the law of the place where the insurance contract was entered into determined the rights of the parties. *Buzzone v. Hartford Accident & Indem. Co.,* 23 N.J. 447, 452, 129 A.2d 561 (1957). Our Supreme Court, in *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 36–37, 417 A.2d 488 (1980), rejected this mechanical *lex loci contractus* rule in liability insurance contracts, and adopted a more flexible approach focusing on the state that has the most significant connections with the parties and the transaction. Thus, the law of the place of contract should apply "unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield." *Id.* at 37, 417 A.2d 488. In making that determination, courts should rely on the principles set forth in *Restatement* §§ 6 and 188. *Id.* at 34–35, 417 A.2d 488.

*Restatement* § 188 provides that in contract actions, the law of the state with the most significant relationship to the parties and the transaction, based on the principles stated in *Restatement* § 6, governs. Under § 188, the court considers such "contacts" as domicile, residence, nationality, place of incorporation and place of business of the parties, as well as the places of contracting, negotiating, and performance. Under § 6, the general considerations are: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. *See Restatement supra,* § 6; *State Farm Mut. Auto. Ins. Co., supra,* 84 N.J. at 34, 417 A.2d 488.

Also relevant is *Restatement* § 193, which applies § 188's "relevant contacts" to casualty insurance contracts. According to

§ 193, the court should apply the law of the state which "the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties...." *Restatement, supra,* § 193. *See Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 134 *N.J.* 96, 103, 629 *A.*2d 885 (1993). This "location of the insured risk" factor under § 193 has less significance "when 'the policy covers a group of risks that are scattered throughout two or more states.'" *Id.* at 104, 629 *A.*2d 885 (quoting *Restatement, supra,* § 193, comment b).

Applying these *Restatement* factors, our Supreme Court in *Gilbert Spruance* adopted the "site specific" approach to interpretation of coverage under a casualty insurance policy for multi-state claims arising from environmental damage. 134 *N.J.* at 107–12, 629 *A.*2d 885; *see also Johnson Matthey Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.,* 250 *N.J.Super.* 51, 60–62, 593 *A.*2d 367 (App.Div.1991). The

> site-specific rule, as set forth in *Restatement* section 193, provides that a casualty-insurance policy should be interpreted under the substantive law of the state that the parties understood to be the principal location of the insured risk, unless another state has a more significant relationship to the parties, the transaction, and the outcome of the controversy under a *Restatement* section 6 analysis.
>
> [*Gilbert Spruance, supra,* 134 *N.J.* at 107, 629 *A.*2d 885.]

Under this approach, more than one body of state law may govern coverage issues arising under a casualty policy. *See General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 *F.*3d 647, 653 (3d Cir.1995). Thus, where the insured risk is predictably multi-state, the principal location of the subject matter of the insurance is less meaningful. *Gilbert Spruance,* 134 *N.J.* at 112, 629 *A.*2d 885. In such cases, "the governing law is that of the state with the dominant significant relationship according to the principles set forth in *Restatement* section 6." *Ibid.*

Part of the analysis requires the court to resolve the "knotty problem" of how to determine where the insured "risk" is located.

*Ibid.* In *Gilbert Spruance,* the Court was faced with the standard pollution exclusion clause with the "sudden and accidental" exception, similar to the clause implicated here. The insured was a Pennsylvania corporation which produced paint in Pennsylvania and which hauled its waste to numerous dump sites in New Jersey. *Id.* at 97–98, 629 *A.*2d 885. Referring to the *Restatement* analysis, *Gilbert Spruance* presented the issue as follows:

> We are thus presented with two options: we can arbitrarily choose either the state of generation, *see Johnson Matthey, supra,* 250 *N.J.Super.* at 60, 593 *A.*2d 367, or the state of disposal, *see A. Johnson & Co. [v. Aetna Cas. & Sur. Co.,* 741 *F.Supp.* 298, 301 (D.Mass.1990), *aff'd,* 933 *F.*2d 66 (1st Cir.1991) ], as the principal location of the insured risk, and assign section 193 significance to that state; or "because the risk at issue here was to some degree transient, a more extended analysis pursuant to § 6(2) is appropriate to determine whether, apart from or in addition to § 193 significance, [New Jersey] or [Pennsylvania] has a more significant relationship to the transaction and the parties." *A. Johnson & Co., supra,* 741 *F.Supp.* at 301. We choose the latter.
>
> [*Id.* at 113, 629 *A.*2d 885.]

Applying the *Restatement* § 6 factors, the Court concluded that when "out-of-state generated waste foreseeably comes to rest in New Jersey, New Jersey has the dominant significant relationship." *Ibid.* In reaching this conclusion, the Court stressed that New Jersey's interpretation of the "sudden and accidental" exception advanced its interest in the health and safety of its citizens:

> as "demonstrated by the enactment of the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 [to –23.24]; the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 [to –48]; the Sanitary Landfill Facility Closure and Contingency Fund Act, *N.J.S.A.* 13:1E–100 [to –176]; the Environmental Cleanup Responsibility Act, *N.J.S.A.* 13:1K–6 [to—35]; and the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 [to –60]...."
>
> [*Ibid.* (quoting *Johnson Matthey Inc., supra,* 250 *N.J.Super.* at 57, 593 *A.*2d 367).]

Presumably, this purpose is met by "securing financial resources both to remediate New Jersey toxic-waste sites and to compensate victims of New Jersey pollution." *General Ceramics Inc., supra,* 66 *F.*3d at 654.

## II

 Here, the motion judge concluded that:

the *Gilbert Spruance* case law should apply ... in weighing all the factors, the states where the pollution occurred is the primary factor and the controlling factor in determining which law should apply. Therefore the Court will apply the laws of the states where the pollution took place.

Permacel argues that the motion judge erroneously concluded that *Gilbert Spruance* established a bright-line rule: the state where the toxic waste comes to rest is the state whose law will apply. We agree that *Gilbert Spruance* does not establish such a rule. Applying the relevant § 6 factors, the *Gilbert Spruance* Court limited its choice-of-law holding to the specific facts before it, which established that New Jersey had the "dominant significant relationship" because: (1) the parties could reasonably foresee that a New Jersey site would receive the waste; (2) New Jersey had a compelling interest in assuring it had the financial resources necessary to clean up the waste as ordered by New Jersey's environmental regulatory agencies; and (3) the health and safety of New Jersey citizens were implicated. Indeed, the Court specifically declined to address the issue raised by this appeal: "[w]e have no occasion to consider in this appeal the problem presented when waste generated in New Jersey predictably is disposed of in another state." *Gilbert Spruance, supra,* 134 *N.J.* at 113, 629 *A.*2d 885. Consequently, our task is to apply the § 6 factors to determine which state or states have the "dominant significant relationship."

We first consider "the needs of the interstate and international systems." *Restatement, supra,* § 6(2)(a). Comment d to § 6 provides that "[c]hoice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them." Thus, a court must consider "the needs and policies of other states and of the community of states." *Ibid.* If a manufacturer from an adjoining state were free to deposit "toxic waste in the host state without fear of subjecting itself to liability under the laws of the host state, it is likely that interstate transportation of hazardous wastes would produce litigation and conflict among states." *Leksi, Inc. v. Federal Ins. Co.,* 736 *F.Supp.* 1331, 1334 (D.N.J.1990). A host

state might choose to restrict use of its waste sites rather than assume the risk of paying to clean up waste stored on its land by foreign corporations. *Ibid.* Consequently, a state will be less inclined to permit toxic wastes to be deposited on its land "unless it can be assured that its law will be applied in determining the respective liabilities of the parties for cleanup costs." *Ibid.* We are convinced that the goal of facilitating commerce among the states will be best satisfied by applying the laws of the host states, in this case, New York, Connecticut and Maryland.

In weighing the "relevant policies" of New Jersey against the "relevant policies of other interested states," *Restatement, supra,* § 6(2)(b) and (c), we conclude that New York, Connecticut and Maryland are the jurisdictions having the most significant relationship to the insurance coverage dispute at issue. While it may be clear that *Gilbert Spruance* did not establish a bright-line rule that the state where the toxic site comes to rest is the state whose law will apply, it is equally clear that the Court stressed that the location of the waste site carries a "very substantial weight" in the "significant relationship" analysis under *Restatement* § 6. *NL Indus., Inc. v. Commercial Union Ins. Co.,* 65 *F.*3d 314, 321 (3d Cir.1995) (interpreting *Gilbert Spruance's* holding); *see also Waste Management, Inc. v. Admiral Ins. Co.,* 138 *N.J.* 106, 133, 649 *A.*2d 379 (1994) (O'Hern, J., concurring), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1175, 130 *L.Ed.*2d 1128 (1995) ("*Gilbert Spruance* . . . emphasiz[es] that coverage issues are generally to be resolved on the basis of the location of the insured risk"); *see also Leksi, Inc., supra,* 736 *F.Supp.* at 1335; *and see* the thorough discussion by Judge Walls in *NL Indus., Inc. v. Commercial Union Ins.,* 938 *F.Supp.* 248, 251–52 (D.N.J.1996). Simply stated, the location of the site is a significant, if not the dispositive, factor in the *Restatement* § 6(2) analysis. Absent some dominant or compelling need to protect the interests of the transporting state, the laws of the states where the hazardous waste sites come to rest should apply.

Here, it was reasonably foreseeable, indeed expected, that Permacel would transport its waste from New Jersey to the five sites in New York, Connecticut and Maryland. *See Gilbert Spruance, supra,* 134 *N.J.* at 111, 629 *A.*2d 885; *Leksi, supra,* 736 *F.Supp.* at 1336. Permacel's Director of Human Resources and Administration testified at his deposition that he made site inspections at the out-of-state locations, checking permits, insurance information and cost factors. Also, because the waste came to rest in New York, Connecticut and Maryland, it was predictable that Permacel would incur legal liability in those states.

Moreover, New York, Connecticut and Maryland have an "overriding interest in seeing to the clean up of toxic wastes located within [their] boundaries." *Id.* at 1334. These states have a predominant interest to protect the general health and welfare of their respective citizens. It is the environment of these states that is being damaged by the waste. Their regulatory schemes are implicated in the "initiation, development, and selection of remedial actions to be undertaken" under CERCLA. 42 *U.S.C.A.* § 9621(f)(1).[3]

Finally, these states, for whatever reasons, do not share our broad interpretation of the "sudden and accidental" exception to the pollution exclusion clause. Issues of environmental cleanup, while matters of national concern, "are intensely local in impact." *A. Johnson & Co., supra,* 741 *F.Supp.* at 301. As evidenced by the divergent views taken by the states in interpreting the "sudden and accidental" exception, it is clear that "different jurisdictions have taken different views with respect to the availability of insurance for clean-up activities." *Ibid.* These views:

---

[3] CERCLA requires that federal regulations promulgated under the Act include, at a minimum: (1) state involvement in decisions whether to initiate a site inspection; (2) state participation in a long-term planning process for remediation of sites within its territory; (3) a state's reasonable opportunity to review and comment on CERCLA feasibility studies and data; and (4) prompt notification to the state and explanation of each action proposed by the Environmental Protection Agency. 42 *U.S.C.A.* § 9621(f)(1)(A) through (H).

are presumably reflections of the considered manner in which the individual states impacted by an environmental problem choose to allocate costs. The basic policies underlying the developing law of environmental remedy strongly support making the site of the alleged damage the governing jurisdiction for choice of law purposes. [*Restatement supra*,] § 6(2)(a) & (e).

[*Ibid.*]

The policy of New York, Connecticut and Maryland of giving effect to the plain meaning of the "sudden and accidental" exception to the pollution exclusion clause "shows that [they are] not concerned with *how* the risk will be allocated[.]" *General Ceramics Inc., supra*, 66 *F.*3d at 657–58. Perhaps their interpretation is driven in part by their interest in "encourag[ing] a secure commercial environment [by] enforc[ing] commercial agreements ... as written...." *Id.* at 657. We should not intrude upon their interpretation of the "sudden and accidental" exception and respective state policies by applying New Jersey law.

We recognize that we recently held that New Jersey substantive law applies where a New Jersey insured disposes of waste in a Pennsylvania site. *J. Josephson, Inc. v. Crum & Forster Ins. Co.*, 293 *N.J.Super.* 170, 679 *A.*2d 1206 (App.Div.1996). In *J. Josephson, Inc.*, plaintiff was a Georgia corporation having its principal place of business in South Hackensack, New Jersey. *Id.* at 176–77, 679 *A.*2d 1206. Hazardous waste created by its wall-covering manufacturing process was disposed of in a site in Pennsylvania. *Id.* at 177–78, 679 *A.*2d 1206. The defendant carriers issued the policies to plaintiff through a New York insurance broker. *Id.* at 178, 679 *A.*2d 1206. In concluding that New Jersey had the "dominant significant relationship" according to *Restatement* § 6 principles, the *J. Josephson* court relied heavily on the Third Circuit's analysis in *General Ceramics Inc., supra*, 66 *F.*3d at 647, since the facts in both cases were "nearly identical." 293 *N.J.Super.* at 189, 679 *A.*2d 1206.

Of the factors set out in *Restatement, supra*, § 6, the Third Circuit in *General Ceramics* found critical the competing rules of law and the interests of each respective state in having its particular rules apply. *General Ceramics, Inc., supra*, 66 *F.*3d at

656. The "competing rules" were Pennsylvania's and New Jersey's respective judicial interpretation of the "sudden and accidental" exception to the pollution exclusion clause. *Ibid.*

What was significant to the *General Ceramics* court was that in *Morton Int'l, Inc., supra,* 134 *N.J.* 1, the New Jersey Supreme Court gave an expansive interpretation of the term "sudden and accidental" despite the fact that the word "sudden" ordinarily connotes a temporal element. *General Ceramics Inc., supra,* 66 *F.*3d at 656–57. *General Ceramics* focused on *Morton Int'l's* "regulatory estoppel" analysis, noting that during the regulatory process in New Jersey to approve the standard CGL policy, the Department of Insurance was told by the carriers that the pollution exclusion clause was intended to clarify the scope of coverage for pollution damages and would not significantly limit the coverage already available. *General Ceramics Inc., supra,* at 656. *See Morton Int'l,* 134 *N.J.* at 31–43. *General Ceramics* quotes the following pertinent passage from *Morton Int'l:*

> The critical issue is whether the courts of this state should give effect to the literal meaning of an exclusionary clause that materially and dramatically reduces the coverage previously available for property damage caused by pollution, under circumstances in which the approval of the exclusionary clause by state regulatory authorities was induced by the insurance [industry's] representation that the clause merely "clarified" the scope of the prior coverage.
>
> [*General Ceramics Inc., supra,* 66 *F.*3d at 657 (quoting *Morton Int'l, Inc., supra,* 134 *N.J.* at 72).]

*General Ceramics* concludes that New Jersey's pro-coverage interpretation of "sudden and accidental" was fashioned "out of concern for insureds who purchase coverage based on [New Jersey's] regulatory approval of the standard CGL policies." *Id.* at 657. Notably, the court observed "[t]he underlying policies prompting this interpretation are protection of the *New Jersey insured* (and of *New Jersey insurance contract negotiation*) and promotion of honesty before [New Jersey's] regulatory agencies." *Ibid.* (emphasis added). In contrast, Pennsylvania's interest in giving a narrow, temporal interpretation of "sudden and accidental," was not implicated because neither party to the suit was a citizen of Pennsylvania. *Ibid.* It therefore concluded that "only

New Jersey's purposes are furthered by the application of its law to this case." *Id.* at 658.

The holdings of *J. Josephson* and *General Ceramics* are distinguishable. In both cases, the carriers issued general liability policies to New Jersey insureds. Indeed, *General Ceramics* squarely holds that New Jersey's interest in applying *Morton International's* "regulatory estoppel" analysis is dominant "because the insured is a New Jersey corporation with its main plant and headquarters in New Jersey and the relevant insurance policy was negotiated and paid for in New Jersey." *General Ceramics Inc., supra,* 66 *F.*3d at 657.

In contrast, here the defendant carriers issued policies to Avery, Permacel's parent company. As stated, the policies were negotiated, underwritten, issued and paid for in California, Avery's principal place of business, and Permacel was named an additional insured solely by virtue of its subsidiary status. Consequently, New Jersey's dominant interest in protecting New Jersey insureds and in promoting honesty before New Jersey's regulatory agencies, *see Morton Int'l, Inc., supra,* 134 *N.J.* at 75, cannot be deemed the dispositive factor on the facts before us.[4] In short, because the importance of *Morton Int'l, Inc.'s* rationale is diminished in the context of our facts, we are convinced that New York's, Connecticut's and Maryland's respective interests, as host states of the waste sites, outweigh the relevant policies of New Jersey. *See Restatement, supra,* §§ 6(2)(b) and (c).

Application of the remaining § 6 factors does not change our result. As to "the protection of justified expectations," *Restatement, supra,* § 6(2)(d), we note that there is no choice-of-law provision in the subject policies. Since Permacel recorded the destinations of its waste shipments on shipping manifests, it was keenly aware that its toxic waste was being transported to the out-of-state sites. Thus, it certainly was foreseeable on its part that

---

[4] We are advised that California has no regulatory procedure for the approval of insurance provisions such as the pollution exclusion clause.

the laws of these states would control this insurance coverage dispute. As to "the basic policies underlying the particular field of law" and "certainty, predictability and uniformity of result," *id.* at §§ 6(2)(e) and (f), we simply endorse Judge Brotman's discussion of these *Restatement* factors expressed in *Leksi, supra,* 736 *F.Supp.* at 1336:

> [T]he Restatement focuses on the location of the insured risk, and distinguishes between those risks which are immovable, such as a house, and those which are not. Toxic waste is a risk that does not fit neatly into the category of immovable risks; wastes are constantly shipped from state to state, and even from country to country, in order to find a resting place. *Environmental law in general recognizes that the most significant aspect of liability for toxic wastes turns not on where the wastes were manufactured, but on where they come to rest. Most environmental laws impose liability for response and remediation costs; the liability is not, for the most part, a result of the manufacturing of the product in the first place.*
> [ (Emphasis added).]

Thus, it would be objectively reasonable to expect that the laws of New York, Connecticut and Maryland would apply here. The parties could or should have known of New York's, Connecticut's and Maryland's overriding interest in their environment and "the reality that in environmental torts of this nature, liability runs with the land." *Ibid.*

Affirmed.