820 A.2d 53 (2003)
359 N.J. Super. 333
LONZA, INC., Plaintiff-Appellant,
v.
THE HARTFORD ACCIDENT AND INDEMNITY COMPANY, American Reinsurance Company, Federal Insurance Company, Continental Insurance Company as Successor to Harbor Insurance Company, Associated International Insurance Company, Gibraltar Casualty Company, Employers Mutual Casualty Company, and Business Insurance Company as successor to London Guarantee & Accident Company of New York, Defendants, and
Zurich Insurance Company, Lexington Insurance Company, New Hampshire Insurance Company, National Union Fire Insurance Company of Pittsburgh, Everest Reinsurance Company, Granite State Insurance Company, and American Empire Surplus Lines Insurance Company as successor to Transport Indemnity Company, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2002.
Decided April 7, 2003.
*54 Philip R. Sellinger argued the cause for appellant (Sills Cummis Radin Tischman Epstein & Gross, attorneys; Mr. Sellinger, of counsel; James M. Hirschhorn, Newark, and David Jay, Florham Park, on the brief).
Kevin T. Coughlin argued the cause for respondent Zurich Insurance Company (McElroy, Deutsch & Mulvaney, attorneys; Mr. Coughlin and Joseph F. Bermudez, Ridgewood, on the brief).
Karol Corbin Walker, Newark, argued the cause for respondents Lexington Insurance Company, New Hampshire Insurance Company, National Union Fire Insurance Company of Pittsburgh and Granite State Insurance Company (St. John & Wayne, attorneys; Ms. Walker and Robert M. Brigantic, on the brief).
Stephen D. Cuyler, Parsippany, argued the cause for respondent Everest Reinsurance Company (Cuyler Burk, attorneys; Mr. Cuyler and Andrew K. Craig, on the brief).
Christopher B. Block, Garden City, NY, argued the cause for respondent American Empire Surplus Lines Insurance Company (L'Abbate, Balkan, Colavita & Contini, attorneys;
*55 Arthur D. Bromberg, of counsel; Mr. Block, on the brief).
Before Judges STERN, COBURN and COLLESTER.
The opinion of the court was delivered by STERN, P.J.A.D.
Following the entry of final judgment on May 23, 2001, plaintiff Lonza, Inc., appeals from a series of orders relating to the trigger and allocation of its coverage claims regarding the cleanup of the site of its manufacturing plant in Rhode Island. The trial judge concluded that the law of Rhode Island applied with respect to the primary policy issued by defendant Zurich Insurance Company ("Zurich"), because it was issued to plaintiff's parent corporation in New York, but that the law of New Jersey governed the excess policies issued by the other defendants because they were issued to plaintiff in New Jersey. It is undisputed that Zurich would provide no coverage under Rhode Island law because, in that state, carriers are liable only if they provide coverage in the year that the "manifestation" occurred, and that, for purposes of Rhode Island law, the "manifestation" occurred in 1979. Zurich did not provide coverage until 1983. The Hartford Accident and Indemnity Company ("Hartford"), which was the primary carrier in 1979, settled with plaintiff, and the claims against Hartford were dismissed. Under the trial court's holding, the remaining defendants are exculpated under New Jersey law because they are excess carriers and would not be reached under the "continuous trigger" doctrine.
Plaintiff argues that "the trial court's application of conflicting legal standards to the trigger and allocation of insurance policies covering the same risk at the same site violates the fundamental purpose of allocation law to distribute loss fairly and rationally among the policies which cover the risk," and that the "March 31, 2000 order applying New Jersey allocation law to the excess carriers alone should be reversed because New Jersey's interest in applying its law of allocation does not overcome the presumption that the law of the insured site should govern." We are told that the excess carrier that covered the risk at the time of "manifestation" in Rhode Island would provide more coverage than under the Zurich policy. Hence, plaintiff asserts that Rhode Island law should govern the issue before us with respect to all policies, and that, alternatively, New Jersey law should govern.
We have been cited to no case law, and have found none, that applies choice-of-law principles to multiple primary and excess policies that cover sites in various states when the dispute relates to the clean-up of a single location. Under the facts before us, we conclude that, for purposes of the forum conflict-of-law principles, the law of the same state must govern resolution of the trigger and allocation issues.

I.
Plaintiff, a chemical manufacturer whose corporate headquarters and principal place of business are in New Jersey, made claims under its primary and excess comprehensive general liability ("CGL") policies for expenses it incurred in cleaning up its production site, the Peterson-Puritan Superfund Site in Rhode Island. All of the policies at issue, except those issued after 1983 by Zurich, were procured in New Jersey. Zurich's policies were procured by plaintiff's parent corporation, Alusuisse of America, Inc. ("ALA"), in New York.
*56 Hartford Accident and Zurich were plaintiff's primary insurance carriers. Lexington Insurance Company ("Lexington"), New Hampshire Insurance Company ("New Hampshire"), National Union Fire Insurance Company of Pittsburgh ("National Union"), and Granite State Insurance Company ("Granite State") (collectively, the AIG defendants) were plaintiff's principal excess insurers. Of the remaining defendants, who were also excess insurers, only two, Everest Reinsurance Company ("Everest") and American Empire Surplus Lines Insurance Company ("American Empire"), are participating in this appeal. American Empire provided excess coverage only in 1977. Everest provided "`high level' excess coverage" in 1978 and 1979, the year of "manifestation." We are told that "Everest's coverage was excess to the AIG defendants' excess coverage."
Plaintiff's suit sought coverage for all costs it incurred in the course of complying with a government-mandated environmental cleanup at eleven sites in eight states. However, only the orders relating to the Peterson Site in Rhode Island remains unresolved. The coverage for cleanup of the Rhode Island site, therefore, provides the exclusive focus of this appeal.
The Zurich policies were issued to plaintiff's parent ALA. Plaintiff and other ALA subsidiaries of ALA were named insureds. Following the hearing of various motions, on October 8, 1999, the trial judge concluded that the "`law of the site' will be applied to all policies in the action with respect to the issue of trigger and allocation for all sites in the action." He also concluded that the "`law of the site' will [ ] appl[y] to the Zurich policies with respect to the pollution exclusion and notice provisions for Lonza's sites in Illinois and Rhode Island," but that New Jersey law would apply with respect to these issues for all other policies. Thereafter, on March 31, 2000, "[c]onsistent with" his "prior choice of law rulings," the trial judge held that "New Jersey law shall apply to the issues of trigger and allocation with respect to all policies issued directly to Lonza by defendants, other than Zurich." After motions for reconsideration were denied and other issues were resolved, on July 21, 2000, the judge granted Zurich's motion for partial summary judgment on the triggering issue for the Rhode Island site and dismissed with prejudice all of plaintiff's claims against Zurich for coverage at that site. He also granted the other carriers' motions for summary judgment. On May 23, 2001, plaintiff entered into a "consent order" with Zurich, dismissing all of its claims against that insurer relating to the remaining sites in states other than Rhode Island, thereby rendering a final judgment. Plaintiff now appeals the determination of the trial judge, which precludes any coverage from the remaining defendants.

II.
Plaintiff is a New York corporation (incorporated in 1970), whose corporate headquarters and principal place of business are in New Jersey. Plaintiff manufacturers chemicals at production facilities throughout the world. In 1982 plaintiff's parent ALA was acquired by Swiss Aluminum Ltd., an international conglomerate with headquarters in Zurich.
Between 1970 and July 1987, plaintiff operated a chemical manufacturing facility on a 9.5-acre parcel, which was one of five active industrial/commercial enterprises within the Peterson Site. During that period, plaintiff discharged what was termed "non-hazardous organic wastes" into two leachfields on the property. Plaintiff subsequently discovered that an underground transporting line had ruptured releasing *57 waste into the environment. The area around the rupture was excavated and the line was repaired.
In 1979, during routine statewide sampling of wells near the Peterson Site, the Rhode Island Department of Health found volatile organic compounds at levels exceeding the U.S. Environmental Protection Agency's ("EPA") drinking water standards. In 1987, plaintiff sold the facility to Trimont Chemicals, Inc. The facility was then sold to Pacific Anchor Chemical Company, a subsidiary of Air Products and Chemicals, Inc. ("Air Products"). In 1989, Air Products sought indemnification and damages from plaintiff for clean-up costs resulting from plaintiff's waste disposal at the site. The total clean-up costs were estimated to range between about $13,000,000 and $49,000,000.
Hartford was the plaintiff's primary insurer from 1971 to 1982. It therefore provided primary coverage at the time of the "manifestation" in 1979. Zurich provided primary coverage from January 1, 1983 to July 1, 1988. Excess coverage was provided by the other defendants at different times. Although plaintiff's claims against these insurers sought coverage under these occurrence-based policies for pollution-related damages, the record does not include copies of any of the pertinent policy provisions, such as the policies' definitions of "occurrence" or the pollution exclusion clauses.[1]
There is no dispute that with respect to all of the insurers, except Zurich, plaintiff executed and maintained those policies from its corporate headquarters in New Jersey, and was the single named insured thereon. However, in 1983, ALA decided to coordinate its insurance coverage for its subsidiaries, including plaintiff, by placing all of the casualty coverage under a single insurance program with Zurich. Neither plaintiff nor a broker or agent acting on plaintiff's behalf participated in the negotiation of any of the Zurich policies. Negotiations of these policies were conducted by a brokerage firm in Massachusetts and ALA in New York. The policies were executed and maintained in Schaumburg, Illinois, the location of Zurich's main administrative office in the United States. The policies were issued to ALA; none were issued to plaintiff. Plaintiff neither signed nor received the policies issued by Zurich to ALA. However, each ALA subsidiary's coverage was separately underwritten to conform to its specific needs, and each was a named insured. Consequently, premiums, deductibles, self-insured retentions, and, in some cases, the terms of coverage, differed among the ALA subsidiaries. Plaintiff was billed directly by the Massachusetts-based broker for its share of the premium. There may be a dispute as to whether plaintiff made the payments.
There is no dispute that a conflict exists in the laws of Rhode Island (the site of the pollution) and New Jersey as to allocation of damages. The parties agree that in Rhode Island, the insurer on the risk on the date that the pollution-related harm manifested provides the coverage, while New Jersey would apportion the coverage responsibility among all of the carriers on the risk during the entire period of the polluting activity. As a result, plaintiff concedes that application of Rhode Island law leaves it with no coverage under any Zurich policy because Zurich was not on the risk until 1983, four years after the "manifestation" occurred. However, because *58 the other insurers' policies, including Hartford's, were executed by and issued to plaintiff in this state, American Empire and Everest represent that under New Jersey allocation rules their excess policies would not be reached if New Jersey's trigger and allocation of damages law applies. In fact, at the argument before us, it was agreed that no excess carriers would be liable to plaintiff under New Jersey's formulation.

III.
Plaintiff argues that the trial court improperly applied the law of two different states to insurance policies that cover the same risk and the same loss. It further asserts that the trial court's distinction between the primary and excess carriers, on the basis of the place of policy procurement and the entity which procured it, cannot rationally justify the application of disparate laws to the same risk. Plaintiff also contends that the trial court erred in its legal analysis and application of the choice-of-law test to the facts. It asserts that the law of the site governs as to all policies unless New Jersey has an overriding interest in having its law applied, and that there is no such interest here. As already noted, however, plaintiff also asserts that, if Rhode Island law does not govern all polices, New Jersey law must apply to all.
As the forum state, New Jersey's choice-of-law principles determine which law to apply. Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996); Marinelli ex rel. Marinelli v. K-Mart Corp., 318 N.J.Super. 554, 562, 724 A.2d 806 (App.Div.1999), aff'd o.b., 162 N.J. 516, 745 A.2d 508 (2000). In general, our Supreme Court has rejected the traditional choice-of-law rule of lex loci delicti (for torts) and lex loci contractus (for insurance contracts) in favor of a more flexible "governmental-interest" standard, which requires application of the law of the state with the greatest interest in, or most significant connections with, the issues raised or the parties and the transaction. Veazey v. Doremus, 103 N.J. 244, 247-49, 510 A.2d 1187 (1986) (tort litigation); State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 36-37, 417 A.2d 488 (1980) (insurance contract).
The first step in this choice-of-law analysis is an inquiry into whether there is "an actual conflict" between the laws of this state and another.[2]Gantes v. Kason Corp., supra, 145 N.J. at 484, 679 A.2d 106. "Any such conflict is to be determined on an issue-by-issue basis." Veazey v. Doremus, supra, 103 N.J. at 248, 510 A.2d 1187.
The Rhode Island Supreme Court settled the trigger of coverage issue for that state when it responded to a question certified to it by the United States Court of Appeals for the First Circuit in CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647, 649 (R.I.1995). The First Circuit asked that court to determine when, under Rhode Island law, there has been an "occurrence" sufficient to trigger coverage under a CGL policy where the insured suffered a chemical spill resulting in property damage that was not discovered for years after the contamination occurred. Ibid. The court responded "that an `occurrence' under a general liability policy takes place when property *59 damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable." CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co., supra, 668 A.2d at 649. See also CPC Intern. v. Northbrook Excess & Surplus Ins. Co., 673 A.2d 71 (R.I.1996) and 144 F.3d 35 (1st Cir.1998).
This holding was subsequently reaffirmed by the Rhode Island Supreme Court in a case where it also specifically declined the appellant's invitation to construe CPC "to require application of a `continuous injury' or similar trigger of coverage where there are allegations made of continuous or progressively deteriorating property damage and personal injury." Truk-Away of R.I., Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 309, 313 (R.I.1999). There, the Court adhered to its prior conclusion that while the seepage of contaminants constituted continuous or repeated exposure to conditions resulting in property damage, "such continuous activity constitutes only one occurrence for purposes of an insurance policy." Ibid. Thus, under Rhode Island law, unless the insurer can establish an applicable policy exclusion, the insurer at the time of the "occurrence," that is when the seepage-caused property damage manifests itself, is discovered, or reasonably was discoverable, has the loss allocated to it, to the extent it provides coverage under the policy. Textron, Inc. v. Aetna Cas. & Sur. Co., 754 A.2d 742, 745 (R.I.2000).
This "manifestation trigger" for coverage is in conflict with New Jersey's law on trigger of coverage and allocation of damages in cases where the property damage which gives rise to the claim for indemnification under a CGL policy results from the gradual progression of pollution. In Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 445-46, 650 A.2d 974 (1994), our Supreme Court had to determine which of an asbestos manufacturer's liability insurers owed a defense and indemnity to it for claims made by persons injured as a result of their continuous exposure to asbestos fibers over a substantial period of time. In the course thereof, the Court acknowledged that the manifestation theory was one of three competing "trigger" theories, but rejected it because of its tendency to "reduce" rather than maximize coverage, stating that "insurers would refuse to write new insurance for the insured when it became apparent that the period of manifestations, and hence a flood of claims, was approaching." Id. at 450, 650 A.2d 974. Instead, the Court held
that when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous trigger theory for activating the insurers' obligation to respond under the policies.
[Owens-Illinois, Inc. v. United Ins. Co., supra, 138 N.J. at 478-79, 650 A.2d 974.]
While the Court did not mandate any particular allocation technique, it required that whatever allocation method was used on remand, the method had to reflect "both the time on the risk and the degree of risk assumed." Id. at 479, 650 A.2d 974.
This "continuous trigger" rule was extended to third-party progressive environmental property damage claims in Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 321, 712 A.2d 1116 (1998). As a result, all carriers on the risk from the time of the initial environmental contamination until its manifestation are deemed liable to respond to the claims. Carter-Wallace, Inc. v. Admiral Ins. Co., supra, 154 N.J. at 325-27, 712 A.2d 1116. The losses were allocated according to a method employed *60 by the federal District Court of New Jersey in Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 978 F.Supp. 589 (D.N.J.1997). That method "vertically allocated each policy in effect for that year, beginning with the primary policy and proceeding upward through each succeeding excess layer." Carter-Wallace v. Admiral Ins. Co., supra, 154 N.J. at 326, 712 A.2d 1116. According to the Court:
We are confident that the Chemical Leaman solution best serves [the public interest factors identified in Owens-Illinois]. Firstly, this approach makes efficient use of available resources because it neither minimizes nor maximizes the liability of either primary or excess insurance, thereby promoting cost efficiency by spreading costs. See Owens-Illinois, supra, 138 N.J. at 472-73, 650 A.2d 974, by respecting the distinction between primary and excess insurance while not permitting excess insurers unfairly to avoid coverage in long-term, continuous-trigger cases. Additionally, adoption of that allocation method will introduce a degree of certainty and predictability into the complex world of environmental insurance litigation in continuous-trigger cases. Moreover, we perceive that that solution is consistent with the contract language, as Commercial Union's second-level excess policy will not be pierced unless and until the primary and first-level excess policies in effect for a given year have been expended.
[Carter-Wallace v. Admiral Ins. Co., supra, 154 N.J. at 327, 712 A.2d 1116.]
Clearly, a conflict exists between the law of Rhode Island and New Jersey regarding the coverage trigger and allocation of damages. The motion judge was therefore required to continue on to the second prong of the conflict-of-laws analysis, and thus "determine the interest that each state has in resolving the specific issue in dispute." Gantes, supra, 145 N.J. at 485, 679 A.2d 106. Using the forum's choice-of-law principles, we are guided by our Supreme Court's clear precedent.
In Gilbert Spruance Co. v. Pennsylvania Mfrs' Ass'n Ins. Co., 134 N.J. 96, 629 A.2d 885 (1993), the Supreme Court concluded that, with respect to liability policies, the forum's law should generally apply because it is usually the situs of the risk and conforms with "`the reasonable expectations of the parties,'" "`unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.'" Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., supra, 134 N.J. at 102, 629 A.2d 885 (quoting State Farm Mut. Auto. Ins. Co., supra, 84 N.J. at 37, 417 A.2d 488). The Court made clear that "[i]n making that determination, courts should rely on the factors and contacts set forth in Restatement sections 6 and 188." Ibid. See Restatement (Second) of Conflict of Laws (1971) ("Restatement "), §§ 6, 188. The Restatement provides that the law of the state with the most significant relationship to the parties and the transaction, as determined by application of the principles articulated in Restatement § 6, governs the contract. Gilbert Spruance, supra, 134 N.J. at 102, 629 A.2d 885. Restatement § 188 provides some relevant "contacts" to be considered in a § 6 analysis, such as "domicile, residence, nationality, place of incorporation and place of business of the parties, and the places of contracting and performance." Id. at 103, 629 A.2d 885.
Pursuant to Restatement § 6, the "`general considerations germane to a court's conflict-of-law analysis'" are:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,

*61 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
[Gilbert Spruance, supra, 134 N.J. at 103, 629 A.2d 885 (quoting State Farm Mut. Auto. Ins. Co., supra, 84 N.J. at 34, 417 A.2d 488).]
Gilbert Spruance noted that in determining the choice-of-law rule to govern disputes relating to casualty-insurance contracts like CGL policies, the analysis must first look to Restatement § 193. Id. at 111-12, 629 A.2d 885. Restatement § 193 "provides that the law of the state that `the parties understood was to be the principal location of the insured risk ... [governs unless] some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties....'" Gilbert Spruance, supra, 134 N.J. at 112, 629 A.2d 885, (quoting Restatement § 193), although
[I]n certain cases when the "subject matter of the insurance is an operation or activity" and when "that operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes ..." Gilbert Spruance, supra, 254 N.J.Super. at 50, 603 A.2d 61. In such situations, the governing law is that of the state with the dominant significant relationship according to the principles set forth in Restatement section 6. Restatement § 193; see A. Johnson & Co. v. Aetna Casualty & Sur. Co., 741 F.Supp. 298, 301-02 (D.Mass.1990), aff'd, 933 F.2d 66 (1st Cir.1991). See Leski [Inc. v. Fed. Ins. Inc.], supra, 736 F.Supp. 1331] at 1333-36 [ (D.N.J.1990)], and J. Josephson, Inc. [v. Crum & Forster Ins. Co.], supra, 265 N.J.Super. 230] at 235-37, 626 A.2d 81 [ (Law Div.1993), aff'd in part and rev'd in part, 293 N.J.Super. 170, 679 A.2d 1206 (App.Div.1996)], 265 N.J.Super. 230, 626 A.2d 81, for examples of section 6 analysis.

[Ibid.]
Gilbert Spruance involved a Pennsylvania company (Spruance), insured by a Pennsylvania corporation (PMA) under policies issued in that state, that dumped polluting waste in four New Jersey sites. Gilbert Spruance, supra, 134 N.J. at 98, 629 A.2d 885. Spruance sought coverage under several CGL policies issued to it by PMA for the multiple toxic-tort claims for personal injury and property damage lodged against it. Ibid. The question presented to the Court was which state's law would be applied to interpret the pollution-exclusion clause upon which PMA based its denial of coverage. Id. at 97-98, 629 A.2d 885. The Supreme Court affirmed our conclusion that, when the parties to an insurance contract can "reasonably foresee" that New Jersey will be the repository of the insured's waste, New Jersey law will govern the interpretation of the contract. Gilbert Spruance, supra, 134 N.J. at 98, 629 A.2d 885. Application of Restatement § 6 principles made clear that New Jersey had the dominant significant relationship. Id. at 113, 629 A.2d 885.
In Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 197, 712 A.2d 634 (1998), the Court rejected the notion that Spruance established "a `bright-line rule' of applying the law of the state in which the waste disposal site is located as long as it was reasonably foreseeable to the contracting parties that the insured's waste would predictably come to rest in that *62 state." The Court held that, despite the difficulty, there must be a "`careful site-specific determination, made upon a complete record,'" and reaffirmed its holding in Spruance which required a Restatement "section 6 analysis" "in order to choose the applicable law that governs the disputed issues." Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. at 197-98, 712 A.2d 634. However, the Court molded the seven factors of section 6 into four categories to avoid duplication: "(1) the competing interests of the relevant states, (2) the national interests of commerce among the several states, (3) the interests of the parties, [and (4) ] the interests of judicial administration."[3]Id. at 197-98, 712 A.2d 634. The Court explained the analytical elements of each of the factors:
1. The competing interests of the states require courts to consider whether application of a competing state's law under the circumstances of the case "will advance the policies that the law was intended to promote." The "law" can be either the decisional or statutory law of a state. The focus of this inquiry should be on "what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation." This is another way of saying that "[i]f a state's contacts [with the transaction] are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply." ...
2. The interests of commerce among the states require courts to consider whether application of a competing state's law would frustrate the policies of other states.... Can the law of one state be disregarded without offense to its purposes?
3. The interests of parties require courts to focus on their justified expectations and their needs for predictability of result. These are basic purposes of contract law, especially insurance law. Restatement section 188 "contacts" with the states, the domicile or residence of the parties, and places of incorporation, business, contracting, and performance, come into play here in assessing what parties might reasonably have expected to be predictable.

4. The interests of judicial administration require a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen. In other words, what choice of law works best to manage adjudication of the controversy before the court. Environmental insurance coverage cases tend to be extraordinarily complex, with multiple parties and multiple issues. Efficient administration of such cases is an important factor to consider.

[Pfizer, supra, 154 N.J. at 198-99, 712 A.2d 634 (Citations omitted; emphasis added).]
Pfizer sought coverage from multiple insurers for environmental contamination liability claims which arose at ninety separate sites in nineteen states and in Puerto Rico; twenty-four of those sites were in New Jersey. Id. at 190, 712 A.2d 634. Pfizer was headquartered in New York, but it had been authorized to do business in New Jersey since 1900, and employed *63 2,200 New Jersey residents at six in-state locations, as well as 500 more in its New York headquarters. Id. at 191-92, 712 A.2d 634. In 1993, the company shipped about $375 million worth of products and services from New Jersey, and spent $31 million for research and development. Pfizer, supra, 154 N.J. at 192, 712 A.2d 634. Four of the insurance companies were either New Jersey corporations or had their principal place of business in New Jersey. Ibid.
The insurers disclaimed coverage on the basis of the pollution-exclusion clauses in their respective CGL policies. Pfizer, supra, 154 N.J. at 191, 712 A.2d 634. The appeal before the Court concerned six out-of-state sites. Ibid. Two were in Pennsylvania, and one was in Massachusetts, North Carolina, Connecticut, and Indiana. Pfizer, supra, 154 N.J. at 191, 712 A.2d 634. The issues were "(1) what law guides the interpretation of the pollution-exclusion clause in the CGL policies and (2) what law governs the validity of the late-notice defenses." Ibid. The insurers argued that either New York or the law of the individual contaminated sites should govern the issues, while Pfizer contended that New Jersey law was applicable to all issues. Pfizer, supra, 154 N.J. at 191, 712 A.2d 634. The trial judge agreed with Pfizer's position, but the Supreme Court granted leave to appeal and reversed after applying the Restatement § 6 factors. Id. at 192, 201-08, 712 A.2d 634.
The Court found that consideration of the facts in light of the relevant factors led to the conclusion that, in a New Jersey forum, either the laws of New York, where Pfizer was headquartered, or the laws of the states of the specific waste sites should be applied to issues involving pollution exclusion clauses. Pfizer, supra, 154 N.J. at 205, 712 A.2d 634. "In the event of a conflict between the law of New York and the law of the waste site," the law of the site was said to prevail "because under the site-specific approach [of Spruance] it would have the dominant significant relationship to the issue." Ibid.
The Court reached the same conclusion on the late notice issue. Pfizer, supra, 154 N.J. at 206-07, 712 A.2d 634. The Court observed that "the governmental interests of a New Jersey forum under the Morton[4]/Spruance analysis are protection of the regulatory process in New Jersey, protection of New Jersey policyholders, protection of the victims of pollution, and protection of the New Jersey environment." Id. at 207, 712 A.2d 634. It concluded that those interests were only "minimally implicated" where the insured was a New York policyholder seeking indemnity for environmental waste liabilities incurred in states other than New Jersey. Pfizer, supra, 154 N.J. at 207, 712 A.2d 634. Although Pfizer's business operations in New Jersey were substantial, its New Jersey work force constituted only five percent of its total workforce. Ibid. Similarly, its New Jersey sales amounted to only five percent of its total revenue. Pfizer, supra, 154 N.J. at 207, 712 A.2d 634. Fourteen Pfizer subsidiaries had home offices in New York, and six were incorporated in New York between 1961 and 1985. Id. at 207-08, 712 A.2d 634. The Court determined that both the "interests of the parties and the interests of commerce favor the laws of either New York or of the waste sites" and, "[a]s between those two, the law of the waste site would appear to have the more dominant significant relationship" to the issues of pollution-exclusion clause interpretation and the late-notice defense. Pfizer, supra, 154 N.J. at *64 208, 712 A.2d 634. Despite the importance of New Jersey's interests in judicial administration, they did not outweigh the interests of the other states. Ibid. See also HM Holdings, Inc. v. Aetna Cas. & Sur. Co., 154 N.J. 208, 211, 712 A.2d 645 (1998), and Unisys Corp. v. Ins. Co. of N. Am., 154 N.J. 217, 219, 712 A.2d 649 (1998) (companion cases to Pfizer, which presented the same conflict-of-law questions with respect to interpretation of the pollution-exclusion clause in CGL policies and the late-notice defense, respectively).[5]
New Jersey's only contact with this transaction is the fact that plaintiff, an additional named insured on Zurich's policy, had its principal place of business in New Jersey. The record is clear that the Zurich policies were negotiated by ALA in New York and its Massachusetts-based broker, and were executed and maintained by Zurich in Illinois, Zurich's principal American administrative office. Plaintiff's inclusion as an additional insured on the Zurich policy was solely because it was an ALA subsidiary whose insurance needs were accommodated by the terms of those policies. In a similar situation, this court concluded that a New Jersey-resident subsidiary named as an additional insured under a policy issued to the parent corporation could not benefit from the Morton-Spruance considerations favoring application of New Jersey law to protect New Jersey policyholders. Permacel v. Am. Ins. Co., 299 N.J.Super. 400, 414, 691 A.2d 383 (App.Div.1997). On the contrary, in Permacel, supra, 299 N.J.Super. at 414, 691 A.2d 383, we found that, because "the policies were negotiated, underwritten, issued and paid for in California, [the parent's] principal place of business, and [that] Permacel was named an additional insured solely by virtue of its subsidiary status," the interests of the polluted site states outweighed the relevant policy concerns of New Jersey. Here, too, New Jersey's interests in securing financial resources to remediate New Jersey toxic waste sites and compensate pollution victims in this state are not implicated. Accordingly, the motion judge properly concluded that the law of Rhode Island, as the site of the risk, governed "the issue of trigger and allocation" with respect to the Zurich policy. Zurich had no reason to expect that New Jersey law would govern its relationship with ALA or any of its other named insured subsidiaries. Other than its location as plaintiff's home state, New Jersey had no connection with either contracting party (ALA or Zurich), and was not the site of the risk.
The other defendant insurers, however, had a New Jersey-centered relationship with plaintiff. Their business with plaintiff was conducted in New Jersey. This state was plaintiff's principal place of business and the insurance contracts were executed in and maintained from plaintiff's corporate headquarters in this state. However, the risks were located out-of-state, and the policies provided only excess coverage.
Excess insurance essentially is a form of additional protection that can be purchased by the insured. Typically, the insured will carry a primary policy of insurance that will cover liability and/or property insurance claims starting at the first dollar of loss or the first dollar in excess of the insured's deductible or self-retention. The insured may obtain additional coverage in the form of an excess policy which by its terms will only come into play once the limits of *65 the primary policy have been exhausted. Such coverage is generally available at a lesser cost than the primary policy since the risk of loss is less than for the primary insurer and there may be lesser duties such as with respect to the duty to defend.
[Holmes's Appleman on Insurance, 2d, section 2.16 (1996) (emphasis added).]
There is no dispute as to the nature of the excess insurance policies or the fact that they provide the same type of coverage in all states. See, e.g., Planet Ins. Co. v. Ertz, 920 S.W.2d 591, 593-94 (Mo.Ct.App.1996). The excess carriers did not produce their policies in the record nor suggest that they do not cover the same risk upon exhaustion of benefits under the primary. Ibid. It is also without dispute that the reasonable expectations of an insured is that the excess insurance is triggered upon, and only upon, the exhaustion of benefits under the primary policy, and that the policy of this forum promotes the reasonable expectations of the insured. See, e.g., Gilbert Spruance, supra, 134 N.J. at 102, 629 A.2d 885; Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992). Therefore, in the absence of any authority cited to us or found by us with respect to the question at hand, we hold consistent with the principles embodied in the Restatement (Second) of Conflict of Laws, that the law of the state that governs the allocation or "trigger" for coverage of the primary policy must also govern the resolution of the same issues with respect to the excess coverage. There is nothing in the record before us which suggests that plaintiff's excess coverage was not triggered incident to the exhaustion of benefits under the primary policy or that the primary policy had to remain issued by any particular carrier or through any particular office or from any particular state. Therefore, at least under the circumstances before us, we conclude as a matter of New Jersey choice-of-law principles that, because the trial judge properly concluded that Rhode Island law governed the primary policy, the relative factors embodied in § 6 of the Restatement, as interpreted in Pfizer, supra, 154 N.J. at 198-99, 712 A.2d 634, requires the law of that state to also control the same issues with respect to the excess coverage during the period Zurich was the primary insurer.
Accordingly, we affirm the trial court's determination that the law of Rhode Island governs the Zurich policy, but reverse its determination concerning the excess policies. The judgment is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion, which may require a determination of the governing law with respect to the Hartford policy and therefore the excess coverage during that period.
NOTES
[1] Zurich notes, however, that those policies "that incepted in and after 1985 contained absolute pollution exclusions."
[2] Everest asserts on appeal that there is a conflict only with respect to the law on trigger of coverage, but not on allocation. According to Everest, because Rhode Island has no law on allocation of coverage, New Jersey's law applies. However, Rhode Island's law on trigger of coverage subsumes the allocation issue because there would be no need to allocate the risk among carriers.
[3] The Court grouped category (3) with one involving "(4) the interests underlying the contract law," as developed in Ceramics Inc. v. Firemen's Fund Ins. Cos., 66 F.3d 647 (3d Cir.1995). Pfizer, Inc. v. Employers Ins. of Wausau, supra, 154 N.J. at 198, 712 A.2d 634.
[4] Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am., 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994).
[5] We need not explore these cases at length as, here, we deal with a single remaining waste site. Suffice it to say that, in both cases, the Court indicated its analysis was based on the principles enunciated in Pfizer. Ibid.